**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**
**GREENSBORO DIVISION**

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| Randolph Hospital, Inc. | ) | |
| d/b/a Randolph Health, | ) | Case No. 20-10247 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| Louis E. Robichaux, IV, as | ) | |
| Liquidation Trustee of Randolph | ) | |
| Health Liquidation Trust, | ) | Adv. Pro. No. 22-02002 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| The Moses H. Cone Memorial | ) | |
| Hospital Operating Corporation d/b/a/ | ) | |
| Cone Health, Moses Cone Physician | ) | |
| Services, Inc. d/b/a Triad Hospitalists, and | ) | |
| and American Healthcare Systems, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**MEMORANDUM OPINION**

THIS ADVERSARY PROCEEDING is before the Court on the motion for

partial summary judgment filed by Louis E. Robichaux, IV, in his capacity as the

Liquidation Trustee for Randolph Health Liquidation Trust (the "Plaintiff"), and the

cross-motion for partial summary judgment filed by The Moses H. Cone Memorial

Hospital Operating Corporation d/b/a/ Cone Health (the "Defendant" or "Cone

Health"). The Plaintiff seeks judgment on his claims for breach of contract, breach

of the implied covenant of good faith and fair dealing, and unfair or deceptive acts

1

or practices (Docket No. 112),[1] and the Defendant seeks summary judgment on the same claims. (Docket No. 113). The Court held a hearing on October 5, 2023, at which Jody Bedenbaugh and Rebecca Redwine appeared on behalf of the Plaintiff and Kelly Cameron, Jennifer Lyday, and John Van Swearingen appeared on behalf of the Defendant. As discussed below, the Court will grant the Defendant's motion for partial summary judgment, in part, and deny the Plaintiff's motion for partial summary judgment.

JURISDICTION

This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334. Under 28 U.S.C. § 157(a) and Local Civil Rule 83.11, the United States District Court for the Middle District of North Carolina has referred this proceeding to this Court. Although several of the claims in this proceeding may constitute "non-core" but "related" matters under 28 U.S.C. § 157(c), including those at issue in the cross-motions for summary judgment, the Plaintiff and the Defendant have expressly consented to bankruptcy court adjudication of the claims asserted in this adversary proceeding. (Docket No. 43). *See Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 674-82 (2015). This Court, therefore, is statutorily and constitutionally authorized to enter a final judgment on all claims in this proceeding.

---

[1] Unless otherwise indicated, record citations refer to docket entries in Adversary Proceeding No. 22-02002, rather than the underlying bankruptcy case, Case No. 20-10247.

APPLICABLE LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Fed. R. Bankr. P. 7056. "A fact is 'material' if proof of its existence or non-existence would affect disposition of the case under applicable law. An issue of material fact is 'genuine' if the evidence offered is such that a reasonable jury might return a verdict for the non-movant." *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021) (quoting *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)). "This court's summary judgment inquiry is whether the evidence 'is so one-sided that one party must prevail as a matter of law.'" *Balogh Assocs. VII LLC v. Dick's Sporting Goods, Inc.*, 1:20CV872, 2022 WL 4624827, at *3 (M.D.N.C. Sept. 30, 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

In applying this standard, this Court will "view all reasonable inferences drawn from the evidence in the light that is most favorable to the non-moving party." *Smith v. Collins*, 964 F.3d 266, 274 (4th Cir. 2020) (quoting *Nader v. Blair*, 549 F.3d 953, 958 (4th Cir. 2008)). Though viewed in the light most favorable, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (quoting *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013)). If there clearly exist material, "factual issues that properly can be resolved

only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250; *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

When presented with cross-motions for summary judgment, as in this proceeding, "the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (cleaned up). The relative burden that each party must satisfy also compels the Court to undertake a separate analysis for each motion; a plaintiff's motion for summary judgment "takes on a slightly different procedural posture" than a defensive motion for summary judgment. *Vales v. Preciado*, 809 F. Supp. 2d 422, 428 (D. Md. 2011). "As to those elements on which it bears the burden of proof [at trial], a [movant] is only entitled to summary judgment if the proffered evidence is such that a rational factfinder could only find for the [movant]." *Smith v. Ozmint*, 578 F.3d 246, 250 (4th Cir. 2009) (internal citations omitted). The court must deny both motions if it finds there is a genuine issue of material fact, "[b]ut if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure Civil § 2720 (4th ed. 2021).

FACTUAL BACKGROUND

The Court finds the following facts to be undisputed based upon the record.[2] The Court recites only those facts relevant to the claims and defenses at issue and reserves for later discussion, as appropriate, the recitation of additional unopposed facts and exhibit excerpts.

In early 2015, Randolph Hospital, Inc. d/b/a Randolph Health ("Randolph Health"), like many rural hospitals, was facing severe financial challenges, operational issues, and difficulties in recruiting physicians to Randolph County. (Def.'s SMF ¶¶ 5-6; Pl.'s SMF ¶¶ 10-11). In response, Randolph Health's Board of Directors began searching for a larger organization to partner with through either a shared services or management agreement. (Pl.'s SMF ¶ 10). Randolph Health sent a request for a proposal to several healthcare entities in the state, including the Defendant. (Def.'s SMF ¶¶ 9-10; Pl.'s SMF ¶ 12). Randolph Health ultimately selected the Defendant as its manager and the parties executed the Management Services Agreement (the "MSA"), which went into effect on June 1, 2016. (Pl.'s SMF ¶ 14).

The MSA, which is a focal point of the allegations and claims in this adversary proceeding, was one part of broader collaborative efforts between the Defendant and Randolph Health. As early as 2012, the Defendant and Randolph

---

[2] The facts are gleaned from the statements of undisputed material fact and responses thereto submitted in support of the cross-motions for summary judgment (Docket Nos. 114, 117, 121, 125), as well as exhibits offered by the parties that are not challenged. Objections to statements of material fact are addressed herein to the extent necessary.

Health were parties to an "Alliance Agreement" aimed at providing higher quality and lower cost health-care coverage to residents of Randolph County.[3] (Def.'s SMF ¶ 3). The Defendant also worked together with Randolph Health on joint ventures such as a senior care program and a cancer center. (Def.'s SMF ¶ 2; Pl.'s SMF ¶ 13).

Through Section 1 of the MSA, Randolph Health officially appointed the Defendant as its manager:

> Randolph hereby appoints Cone Health as the manager for Randolph during the Term of this Agreement as further specified in Section 3 below. Randolph grants to Cone Health the full power, authority and responsibility for management of Randolph, subject to the Articles of Incorporation and Bylaws of Randolph and the governance oversight of the board of directors of Randolph (the "Board").

(Pl.'s Ex. 6, § 1).

Section 3, in turn, provides that "Cone Health shall provide a full range of day-to-day operational and administrative management services for Randolph" under the MSA. The same section then provides an enumerated list of sixteen specified services to be provided by the Defendant under the MSA. (Pl.'s Ex. 6, §§ 3(a)-(p)). The MSA required that the Defendant "perform its duties under [the MSA] consistent with the standards of the healthcare industry for an independent management company contracting on an arm's length basis to provide comprehensive management services to a hospital and healthcare system of the size and capabilities of Randolph." (Pl.'s Ex. 6, § 3).

---

[3] The "Alliance Agreement" between Randolph Health and the Defendant included broad commitments to keep each other appraised of strategic planning efforts, coordinate in addressing physician needs and recruitment, and pursue cooperative efforts to increase the availability and accessibility of health care services within select parts of the Piedmont Triad. (Orth June 28 Dep. Ex. 2).

The MSA provided that, to the extent Randolph Health has the executive positions of CEO, COO, and CFO, those "Key Personnel" would become employees of Cone Health upon the execution of the MSA, with Randolph Health reimbursing Cone Health for their salaries and benefits. (Def.'s SMF ¶ 27; Pl.'s Ex. 6, § 3(a); Orth June 23 Dep. 19:19-22). At the time of the MSA's execution in June 2016, Randolph Health's CEO was Steve Eblin, its COO was Angela Orth, and its CFO was Murray "Skip" Marsh. (Pl.'s SMF ¶¶ 1, 4; Eblin Dep. 15:5-15, 27:24-28:4). Randolph Health, however, experienced turnover among those Key Personnel positions during the term of the MSA. Marsh left his position as CFO in September 2017, at which point Eblin and Orth decided not to fill the position and instead left Loretta Long in place as interim CFO. (Def.'s SMF ¶¶ 27, 29; Orth June 23 Dep. 88:11-17; Eblin Dep. 137:21-138:24). Eblin left his role as CEO in July 2018 at which point Orth assumed that position. (Orth June 23 Dep. 78:19-25, 88:2-4; Pl.'s SMF ¶ 78)). No replacement COO was hired at that time. (Orth June 23 Dep. 88:2-10).

There is no dispute that the Defendant fulfilled its duty to develop a management action plan (the "MAP"), which was designed to assess Randolph Health's financial and operational challenges and identify the means and methods to address them. (Def.'s SMF ¶ 34; Pl.'s SMF ¶ 23). Among the hundreds of findings and recommendations generated by the MAP was Randolph Health's need for considerable capital investments and assistance in resolving its cash flow deficiency. (Def.'s SMF ¶ 35; Pl.'s SMF ¶ 26). Upon the MAP's presentation to

Randolph Health's Board of Directors in December 2016, it was clear that Randolph Health faced significant financial distress. (Def.'s SMF ¶¶ 36-37; Pl.'s SMF ¶¶ 26, 29). And, although Randolph Health was realizing immediate savings by tapping into the Defendant's purchasing power and supply line, both parties understood that the MSA alone would not save Randolph Health. (Def.'s SMF ¶¶ 32, 35-36; Pl.'s SMF ¶¶ 25, 29; Eblin Dep. 22:7-24:18).

By early 2017, the parties knew that Randolph Health required a strategic partner to survive and, to that end, began to explore the possibility of a Cone Health-Randolph Health integration or merger. (Def.'s SMF ¶¶ 37-38; Pl.'s SMF ¶¶ 25, 29; Eblin Dep. 22:7-24:18). On or about May 23, 2017, the parties entered into a letter of intent (Pl.'s Ex. 10, the "LOI") for Randolph Health's integration into Cone Health. (Def.'s SMF ¶ 44; Pl.'s SMF ¶¶ 29-30; Eblin Dep. 22:7-24:18). While non-binding in many respects, the LOI required exclusive dealings between the parties while it remained in effect. (Pl.'s SMF ¶ 30; LOI § 2(B)). The LOI provided that either party could terminate the arrangement if an integration agreement was not executed by January 1, 2018, but by separate amendments, the parties extended that date to March 31, 2018, and then again to September 30, 2018. (Def.'s SMF ¶ 47; Roskelly Decl. ¶ 49; Pl.'s SMF ¶ 30).

After executing the LOI, and as part of its exploration of a potential merger, the Defendant undertook a time-consuming and labor-intensive due diligence process. (Def.'s SMF ¶¶ 48, 50; Roskelly Decl. ¶¶ 51, 54). The Defendant's projections that developed during this due diligence period painted a dire picture of

Randolph Health, namely multi-million-dollar operating losses and ever-growing capital investment needs. (Def.'s SMF ¶¶ 51-52; Roskelly Decl. ¶ 55; Pl.'s SMF ¶¶ 36-38). The Defendant estimated that Randolph Health needed $36 million over a five-year period to meet its infrastructure needs and would run out of cash by 2019. (Pl.'s SMF ¶¶ 37-38, 41). By spring of 2018, the Defendant determined that Randolph Health's severe financial pressures were impacting its day-to-day operations and debt management, leading to its conclusion that Randolph Health could not continue to exist while maintaining the status quo. (Pl.'s SMF ¶¶ 42, 44-45).

Randolph Health's patient coverage and physician network continued to deteriorate as well. At the onset of the MSA, Randolph Health's COO, Orth, sent an email to a colleague at Cone Health documenting her understanding that Randolph Health and the Defendant would work collaboratively to develop a growth and ambulatory strategy to ensure that Randolph Health had adequate physician coverage. (Pl.'s SMF ¶ 62; Roskelly Dep. Ex. 6). But on April 27, 2018, Randolph Health closed its ambulatory surgery center, evidencing its continuing and deepening financial distress. (Def.'s SMF ¶ 55; Roskelly Decl. ¶ 58; Pl.'s SMF ¶¶ 36-38).

Randolph Health's physician network also steadily declined during the period of the MSA. In 2016, the jointly-supported MAP had identified several clinical services lines that were ripe for growth by Randolph Health, including cardiology, gastroenterology, and orthopedics. (Pl.'s SMF ¶¶ 25-27). Several physicians in those

specialties, however, departed Randolph Health and joined or affiliated with the Defendant instead. For instance, the Defendant acquired Carolina Cardiology, which then left Randolph County for a one-year period prior to returning. (Pl.'s SMF ¶¶ 66-67; Eblin Dep. 102:23-103:16; Def.'s SMF ¶ 81). Dr. Rajesh Gupta, a gastroenterologist, similarly joined Cone Health and departed Randolph County, (Pl.'s SMF ¶¶ 66, 68; Orth June 23 Dep. 56:8-25; Def.'s SMF ¶ 81), as did Dr. Shakeel Durrani, an orthopedic surgeon. (Pl.'s SMF ¶¶ 71-72).

As it obtained more information through the due diligence process, the Defendant began contemplating a "Plan B" in the event the parties were unable to consummate a hoped-for integration. (Def.'s SMF ¶ 57; Roskelly Decl. ¶ 60). On March 31, 2018, the Defendant acceded to Randolph Health's request to amend the LOI to remove the exclusivity provision and allow Randolph Health to pursue other integration opportunities. (Def.'s SMF ¶ 59; Roskelly Decl. ¶ 61). By April 2018, upon determining that bankruptcy was an ultimate outcome for Randolph Health, the Defendant began to explore how it could participate in a potential bankruptcy if it elected not to proceed with integration or merger. (Pl.'s SMF ¶¶ 45, 57; Roskelly Dep. 89:2-25). In late May 2018, during its Board Executive Committee meeting, the Defendant formally adopted a so-called "go it alone" strategy in Randolph County due to Randolph Health's financial distress; soon after, and despite reputational, market, and legal risks, the Defendant's Board of Directors voted unanimously to discontinue the due diligence process for a potential merger with

Randolph Health and formally terminated the LOI. (Def.'s SMF ¶ 60; Roskelly Decl. ¶ 62; Pl.'s SMF ¶¶ 58-59).

Although the LOI was no longer in place, Randolph Health and the Defendant maintained their contractual relationship through the MSA. (Def.'s SMF ¶ 80). Despite numerous alleged breaches, Randolph Health never notified the Defendant of any intent to terminate the MSA until Randolph Health's sale to American Healthcare Systems, LLC ("AHS") nearly three years later (Def.'s SMF ¶ 79); however, Randolph Health's CEO and COO conducted evaluations of the Defendant's performance under the MSA with the aim of justifying a reduction in the management fee. (Pl.'s SMF ¶ 75; Def.'s SMF ¶ 66). Eblin, with the assistance of Orth, began the process of discussing a reduced fee with the Defendant's then-CEO, Terry Akin, by sending two letters requesting a reduction in the management fee: (i) a letter dated June 13, 2018, identifying examples of insufficient managerial support and (ii) a follow up letter dated June 21, 2018, which, at the request of Akin, identifies services which Eblin felt were no longer needed. (Pl.'s SMF ¶ 76). Although Eblin maintained his belief that the Defendant was not acting in bad faith or with poor intent, he identified "lapses" in the Defendant's performance under the MSA. (Def.'s SMF ¶¶ 64-66).

As part of their efforts to negotiate a reduction in the management fee, Eblin and Orth also developed a chart entitled "MSA Overview," which was a scorecard or evaluation of the Defendant's performance on sixteen separate items or services that the Defendant was to provide to Randolph Health under the MSA. (Pl.'s SMF

¶ 80; Def.'s SMF ¶ 71). The listed services in the scorecard corresponded to the services listed in subsections (a) through (p) of Section 3 of the MSA. (Def.'s SMF ¶ 72). There were two versions of the MSA overview created, one dated June 12, 2018 (the "June 2018 MSA Overview"), and another dated January 24, 2019 (the "January 2019 MSA Overview"). According to the June 2018 MSA Overview, the Defendant was performing or had "fulfilled" eight of the sixteen "items" called for under the MSA; conversely, the overview stated that the Defendant was partially performing four and had not fulfilled four other services. (Def.'s SMF ¶¶ 72-73; Roskelly Decl. ¶ 76).[4] Orth shared the June 2018 MSA Overview with Randolph Health's Board of Directors in July 2018 (Orth June 28 Dep. Ex. 28), but this initial effort at negotiation was ineffective; the Defendant did not agree to a reduced management fee. (Pl.'s SMF ¶¶ 76-77). Orth, however, later revisited the issue in January 2019, around which time the Defendant agreed to an annual reduction of $600,000, which equated to a 40% reduction in the management fee. (Orth June 28 Dep. 159:10-160:7).[5]

---

[4] The Plaintiff asserts that Orth created the January 2019 MSA Overview as part of her renewed efforts to negotiate a lower management fee. (Orth June 28 Dep. Ex. 34). The January 2019 MSA Overview reflects that the Defendant was performing or had "fulfilled" four of the sixteen items, was partially performing five and had failed to fulfill six (one item was marked as "N/A").

[5] The parties dispute the extent to which the Defendant was shown or made aware of either version of the MSA overview. The Defendant maintains that the June 2018 MSA Overview was shown to Akin in late June 2018, but the Plaintiff argues that there is no evidence in the record supporting that assertion. (Def.'s SMF ¶ 71; Docket No. 125 ¶ 71). There is a similar question over whether the Defendant ever viewed the January 2019 MSA Overview. Orth testified that she shared the underlying information reflected in the January 2019 MSA Overview but was unable to say with certainty that she provided the document itself to the Defendant's leadership team. (Orth June 23 Dep. 130:14-132:2).

The MSA remained intact with the reduced management fee and Randolph Health turned to evaluating alternative strategies after the termination of the LOI. (Def.'s SMF ¶ 58). To that end, Randolph Health engaged Louis Robichaux, IV, and Ankura Consulting Group to provide consulting services and act as its restructuring advisor. (Def.'s SMF ¶ 75; Roskelly Decl. ¶ 77). Eventually, on March 6, 2020, Randolph Health and its related entities filed petitions for relief under chapter 11 of the Bankruptcy Code. (Case No. 20-10247, Docket No. 1). Although Randolph Health and the Defendant restarted preliminary strategic discussions after the bankruptcy filing and maintained the MSA, those discussions never resulted in a merger or purchase. (Def.'s SMF ¶¶ 76-78; Roskelly Decl. ¶¶ 78-79). Instead, with the approval of this Court, Randolph Health entered into an Asset Purchase Agreement with AHS for substantially all of Randolph Health's assets; after various amendments and a supplemental order, the sale eventually closed on July 1, 2021. (Case No. 20-10247, Docket Nos. 509, 563, 851; Def.'s SMF ¶ 80).

## DISCUSSION

The Plaintiff argues that the undisputed facts prove the Defendant failed to fulfill its duties under the MSA, recruited and hired physicians previously affiliated with Randolph Health, and ultimately used information it obtained as manager to solely benefit its own expansion efforts in Randolph County. The Plaintiff asserts he is entitled to judgment as a matter of law as to the Defendant's liability on his claims for breach of contract, breach of the implied covenant of good faith and fair

dealing, and the North Carolina Unfair and Deceptive Act or Practice statute (the "UDP"), N.C. Gen. Stat. § 75-1.1, with the parties proceeding to trial on damages.

Conversely, the Defendant asserts that Randolph Health, through the statements of its leadership team and its conduct, waived any claims for breach of the MSA. Alternatively, the Defendant maintains it is entitled to partial summary judgment on nine of the twelve alleged breaches of the MSA because it fully satisfied those duties or Randolph Health demurred from requiring it to perform. The Defendant likewise seeks summary judgment on the Plaintiff's breach of the implied covenant cause of action, contending that the claim is part and parcel of, and must rise and fall with, the breach of contract claim. If successful in obtaining judgment as a matter of law on the breach of contract claim, the Defendant contends that the claim for breach of the implied covenant cannot survive on its own. Finally, the Defendant states the record is devoid of the egregious or aggravating circumstances necessary to support the Plaintiff's UDP claim, which is closely tied to the Defendant's performance under the MSA.

## 1. Breach of Contract

The Plaintiff alleges that the Defendant breached the MSA by failing to perform several material obligations and by failing to manage Randolph Health in accordance with the agreed upon industry standard contained within the MSA. (Docket No. 112, p. 4). The Plaintiff insists that the Defendant's mismanagement and failure to perform under the MSA, during an already perilous financial situation, further diminished the value of Randolph Health's operations and

accelerated its insolvency. (Am. Compl. ¶ 86). The Defendant disagrees, claiming the Plaintiff is attempting to post-hoc rewrite and expand the duties called for under the MSA beyond the plain text of the contract; the Defendant maintains it either fulfilled all required obligations under the MSA or that Randolph Health waived or declined performance.

Although the parties dispute whether the Defendant ultimately fulfilled its responsibilities under the MSA, the cross-motions for summary judgment on the breach of contract cause of action turn, in large measure, on the outcome of three inquiries. First, what was the scope of duties that the Defendant was to perform under the MSA and what, if any, performance standard would the Defendant be held to in fulfilling its obligations? Second, did Randolph Health, through its conduct or the communications of its CEOs and COOs, waive potential breaches of the MSA or the Defendant's obligation to perform certain enumerated duties? Third, what evidence demonstrates that the Defendant breached any of those enumerated duties under the MSA? The parties' arguments and briefing repeatedly touch on these questions, the answers to which are vitally important to assessing whether the Plaintiff's breach of contract claim may proceed to trial. The Court considers each of these in turn.

### A.    Scope of Duties and Performance Standard under the MSA

The Plaintiff and Defendant vigorously dispute the range of services that the Defendant was expected to provide under the MSA and the standard under which it could ultimately satisfy those duties. In line with the MSA's choice-of-law provision,

the Court will construe the contract according to North Carolina law. (Pl.'s Ex. 6,

§ 26).

The parties dispute the meaning, effect, and interplay between sections 1 and

3 of the MSA as they relate to establishing the Defendant's managerial duties.

> 1. Appointment of Cone Health as Manager – Randolph hereby appoints Cone Health as the manager of Randolph during the Term of this Agreement *as further specified in Section 3 below*. Randolph grants to Cone Health the full power, authority and responsibility for management of Randolph, subject to the Articles of Incorporation and Bylaws of Randolph and the governance oversight of the board of directors of Randolph (the "Board").
> …
> 3. Management Services – Cone Health *shall perform its duties under this Agreement consistent with the standards of the healthcare industry for an independent management company contracting on an arm's length basis to provide comprehensive management services to a hospital and healthcare system of the size and capabilities of Randolph*. Cone Health shall manage Randolph in a manner that assists Randolph in fulfilling its policies relating to charitable care and community benefit. Cone Health *shall provide a full range of day-to-day operational and administrative management services for Randolph, including the following*:

(Pl.'s Ex. 6, §§ 1, 3) (emphasis added). Section 3 then lists sixteen services

(separately enumerated as subsections (a) – (p)) that the Defendant was to provide

including hiring, employing, and directing a CEO, COO, and CFO for Randolph

Health (§ 3(a)), providing corporate managerial resources (§ 3(b)), reporting

regularly to the Randolph Health Board of Directors (§ 3(c)), administering

Randolph Health's accounting system (§ 3(e)), and developing a physician

recruitment plan for Randolph Health (§ 3(g)).[6]

---

[6] The Court will address below, in greater detail, the parties' positions as to alleged breaches of specific services listed within Section 3. (*See* infra, section 1(C)).

The Plaintiff argues that the unambiguous language of the two sections required the Defendant to provide "comprehensive" services beyond those explicitly listed in the enumerated subsections (a) – (p) of Section 3. (Docket No. 124, pp. 3-6). The Plaintiff points to the "full power, authority and responsibility for management of Randolph" granted to the Defendant under Section 1 of the MSA, along with Section 3's requirement that the Defendant perform its duties consistent with an independent management company contracting "to provide comprehensive management services" as evidence that the Defendant's responsibilities went beyond the range of specific tasks within Section 3. (Docket No. 124, pp. 3-4). Conversely, the Defendant argues that the term "comprehensive" in Section 3 merely denotes the manner in which the Defendant must "perform its duties under [the MSA]." (Pl.'s Ex. 6, § 3). The Defendant argues that the Plaintiff is impermissibly attempting to use the "comprehensive" label to require additional services beyond those bargained for and included in the MSA. (Docket No. 115, pp. 7-8; Docket No. 131, pp. 2).

A successful breach of contract claim must establish (1) the existence of a valid contract and (2) the breach of the terms of that contract. *Wells Fargo Ins. Servs. USA, Inc. v. Link*, 827 S.E.2d 458, 472 (N.C. 2019)). "Written contracts are to be construed and enforced according to their terms" and "must receive a reasonable interpretation, according to the intention of the parties at the time of executing them, gathered from the language employed by them." *Galloway v. Snell*, 885 S.E.2d 834, 836 (N.C. 2023) (internal citations omitted). When the language of the

contract is clear and unambiguous, its "meaning and effect is a question of law for the court – not the jury;" the court must simply give effect to the unambiguous terms, which "may not be contradicted by parol or extrinsic evidence." *Id.* (internal citations omitted).

Determining the parties' intent is more challenging, however, when the terms are ambiguous, i.e., "the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations." *Id.* (citing *Register v. White*, 599 S.E.2d 549, 553 (N.C. 2004)). "An ambiguity can exist when, even though the words themselves appear clear, the specific facts of the case create more than one reasonable interpretation of the contractual provisions." *Id.* (citing *Register*, 599 S.E.2d at 553). If the Court finds terms to be ambiguous, that portion of the "contract's meaning is a factual question for the jury and parol evidence may be introduced not to contradict, but to show and make certain what was the real agreement between the parties." *Id.* (internal citations omitted); *see also Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs., P.C.*, 658 S.E.2d 918, 921 (N.C. 2008).

In assessing the Defendant's responsibilities under the MSA, the Court must consider Sections 1 and 3 together. Not only does Section 1 explicitly cross-reference Section 3, but "a contract must be interpreted as a whole, and individual provisions within a contract must be interpreted within the context of the entire contract." *Fulford v. Jenkins*, 672 S.E.2d 759, 763 (N.C. Ct. App. 2009). In so doing, the Court finds the language to be unambiguous as it relates to articulating the scope of the Defendant's duties. Section 1 does grant the Defendant "the full power, authority

18

and responsibility for management of Randolph," but the preceding sentence, which the Court finds to be the operative sentence for purposes of outlining the Defendant's duties, "appoints Cone Health as the manager for Randolph during the Term of this Agreement *as further specified in Section 3 below*." (Pl.'s Ex. 6, § 1) (emphasis added). Section 3, in turn, is entitled "Management Services" and describes a range of "operational and administrative management services," through enumerated subsections, that the Defendant was to provide to Randolph Health. (Pl.'s Ex. 6, § 3(a)-(p)). Section 1's language granting "full power, authority and responsibility" simply empowers the Defendant to fulfill the management services described in Section 3, establishing a clear hierarchy of managerial authority, with the Defendant assuming "full power" subject only to Randolph Health's Board of Directors and governing documents. The Court concludes that the language does not expand the scope of the Defendant's duties under the MSA beyond those specified in Section 3.

The Court must therefore look to Section 3 to discern the scope of the Defendant's duties, which states that "Cone Health shall provide a full range of day-to-day operational and administrative management services for Randolph, including the following: [listed subsections (a) through (p)]." The introductory paragraph's use of the term "including," which the MSA itself defines to mean "includes, but is not limited to," (Pl.'s Ex. 6, § 23), supports the Plaintiff's expansive reading of the Defendant's responsibilities under the MSA. But an equally plausible reading of the term "including" within Section 3, and one that better harmonizes

with the surrounding language of the MSA, is that the term and the subsequently listed subparagraphs established a baseline for the "day-to-day operational and administrative management services" that the Defendant was to perform, but still allowed the parties the flexibility to add, by separate agreement or amendment, to that existing list. In fact, many of the subsections themselves envision potential add-on services.[7]

After analyzing the operative language of Section 3 and viewing it within the context of the surrounding provisions of the MSA, the Court finds that the Defendant's duties under the MSA are those enumerated services listed in subsections (a) through (p), along with any additional services the parties negotiated by separate agreement. In deciding the merits of the parties' summary judgment motions on this cause of action, the Court will analyze whether the Defendant breached any of the specific duties listed in Section 3.

While the MSA is unambiguous as it relates to the scope of the Defendant's duties, the Court finds its language regarding the performance standard less clear. Initially, the Court observes that the performance standard is defined within the MSA, with the Defendant required to "perform its duties under [the MSA] consistent with the standards of the healthcare industry for an independent management company contracting on an arm's length basis to provide

---

[7] Section 3(b) provides that "At the request of Randolph, Cone Health shall provide such additional services to Randolph pursuant to the fees, scope and other terms and conditions of the provision of such services as may be mutually agreed upon by the parties." (Pl.'s Ex. 6, § 3(b)). Similarly, Section 3(h) states that "Cone Health may provide charge master review and related management services for Randolph for a separate fee." (Pl.'s Ex. 6, § 3(h)).

comprehensive management services to a hospital and healthcare system of the size and capabilities of Randolph." (Pl.'s Ex. 6, § 3). The Court cannot simply ignore this detailed definition, despite the Defendant's assertion that the MSA's performance standard is "undefined" and "nonexistent." (Docket No. 115, p. 6 n.3). "Where a [contract] defines a term, that definition is to be used." *Singleton v. Haywood Elec. Membership Corp.*, 357 N.C. 623, 629 (N.C. 2003) (internal citations omitted). Consequently, the Court must not only assess whether the Defendant completed the duties required of it under the MSA but also whether its performance in doing so met the defined standard.

Although defined within the MSA, the standard itself is ambiguous—there are no cross-references, sub-definitions, or other means to discern what the specific healthcare standard is for each management service that the Defendant was to provide under the MSA. Because the Court finds the definition of the performance standard to be ambiguous, its meaning is a question of fact and additional parol evidence may be introduced to show the intent of the parties. *Galloway*, 885 S.E.2d at 836. Moreover, "if technical terms are used in a contract, expert testimony is admissible to explain the meaning of such terms as an aid in interpreting the instrument." *Smith v. Childs*, 437 S.E.2d 500, 506-507 (N.C. Ct. App. 1993) (citing *Stewart v. Raleigh & A. Air Line R. Co.*, 53 S.E. 877, 880 (N.C. 1906)). Due to its ambiguity and reference to technical benchmarks within the healthcare industry, the meaning of the MSA's performance standard requires further factual

21

development, including through expert testimony.[8] As explained in the contemporaneously entered Order Overruling Objection to Expert Report and Testimony (Docket No. 136), the proposed evidence from the parties' healthcare industry experts will assist the Court in understanding the meaning and application of the MSA's performance standard.

There are genuine issues of material fact as to what the performance standard is and whether the Defendant's actions satisfied that standard for the services to be provided under the MSA. As described in more detail below, *see* infra Section 1(C), the inability of the Court to discern and apply the performance standard at this procedural stage precludes summary judgment on many of the specifically cited breaches of Section 3.

### B.    Waiver

The Defendant asserts the affirmative defense of waiver against the Plaintiff's breach of contract cause of action, pointing to Randolph Health's course of

---

[8] Federal courts consistently find summary judgment to be inappropriate where the industry standard is ambiguous or where there is conflicting evidence as to what industry standard applies. *See, e.g.*, *Ford v. Panasonic Corp. of N. Am.*, 284 Fed. Appx. 901, 902 (3d Cir. 2008) (finding that if there is ambiguity in industry guidelines, there may be "a colorable factual dispute for the experts to resolve," but if "the language at issue was subject to only one reasonable interpretation … summary judgment would be proper."); *Matson v. Geico Cas. Co.*, No. 19-CV-01090-NRN, 2020 WL 406085, at *5 (D. Colo. Jan. 24, 2020) (denying summary judgment where the plaintiff "presented sufficient evidence to create a genuine issue of material fact as to what the industry standard is."); *In re Charlotte Com. Grp., Inc.*, No. 01-52684, 2005 WL 2177126, at *7 (Bankr. M.D.N.C. July 6, 2005) (finding summary judgment was not appropriate where parties' experts had "conflicting opinions" on whether "generally accepted accounting principles and practices" controlled the preparation of monthly borrowing base certificates and, if so, whether the certificates were prepared in accordance with that standard).

conduct and the communications from its leadership team. (Docket No. 115, pp. 11-16). Because the Defendant's arguments as to waiver are common to all the alleged breaches, the Court will assess them together.

Under North Carolina law, "[a] waiver is a voluntary and intentional relinquishment of a known right." *Adder v. Holman & Moody, Inc.*, 219 S.E.2d 190, 195 (N.C. 1975) (citing *Green v. Patriotic Ord. Sons of Am.*, 87 S.E.2d 14, 18 (N.C. 1955)). "[T]he concept of waiver [is] . . . designed to prevent the waiving party from lulling the other party into a belief that strict compliance with a contractual duty will not be required and then either suing for noncompliance or demanding compliance for the purpose of avoiding the transaction." *Wall Recycling, LLC v. 3TEK Global, LLC*, 497 F. Supp. 3d 30, 44-45 (M.D.N.C. 2020) (quoting 13 WILLISTON ON CONTRACTS § 39:15 (4th ed.)).

The North Carolina Supreme Court has clarified that "a party may waive the breach of a contractual provision or condition without consideration or estoppel if

1. The waiving party is the innocent, or nonbreaching party, and
2. The breach does not involve total repudiation of the contract so that the nonbreaching party continues to receive some of the bargained-for consideration … and
3. The innocent party is aware of the breach, and
4. The innocent party intentionally waives his right to excuse or repudiate his own performance by continuing to perform or accept the partial performance of the breaching party."

*Wheeler v. Wheeler*, 263 S.E.2d 763, 766-767 (N.C. 1980); *accord Nakell v. Liner Yankelevitz Sunshine & Regenstreif, LLP*, No. 1:04CV00820, 2006 WL 3848697, at *7 (M.D.N.C. Dec. 29, 2006)).

Waiver "is usually a question of intent." *Adder*, 219 S.E.2d at 195 (citing *Green*, 87 S.E.2d at 18); *see also Wheeler*, 263 S.E.2d at 766 (observing, from prior decision, "that the crucial question was whether the plaintiff intended to waive his breach[.]"). "The intention to waive may be expressed or implied from acts or conduct that naturally leads the other party to believe that the right has been intentionally given up[;] … [t]here can be no waiver unless it is intended by one party and so understood by the other, or unless one party has acted so as to mislead the other." *Klein v. Avemco Ins. Co.*, 220 S.E.2d 595, 599 (N.C. 1975); *see also Patterson v. Patterson*, 529 S.E.2d 484, 492 (N.C. Ct. App. 2000).

Accordingly, the Defendant must show that Randolph Health intended to relinquish certain of its rights under the MSA and manifested that intention either expressly or impliedly. It points to three indicia of waiver: (1) Randolph Health's leadership team declined ongoing performance of certain enumerated services and also indicated it was ultimately satisfied with what it received under the MSA; (2) Randolph Health never sent any notice to the Defendant of any breach, material or otherwise, under Section 10 of the MSA; and (3) Randolph Health continued to send payments to the Defendant rather than repudiating any ongoing performance obligations under the MSA. (Docket No. 115, pp. 13-16).

i. The Actions and Communications of Randolph Health's Leadership Team

The Defendant argues that Randolph Health, through its CEOs, repeatedly waived past breaches as well as ongoing performance of certain services under the MSA. The Defendant points to communications from CEO Eblin representing that

Randolph Health had "consistently gotten great support" under sections of the MSA the Plaintiff now contends were breached, including revenue cycle operations (Section 3(h)), human resources (Section 3(k)), and accreditation (Section 3(n)). (Eblin Dep. Ex. 21). Similarly, the Defendant relies on the determination of Randolph Health's CEO Eblin and COO Orth to not replace the departing CFO as conclusive evidence that Randolph Health waived any obligation imposed on the Defendant to fill the position under Section 3(a) of the MSA. (Docket No. 120, p. 4).

In a separate, but related argument, the Defendant asserts that Randolph Health prospectively waived, and indicated it no longer required, any ongoing services under Sections 3(c), (e), (g), (i), (m), (o), and (p) of the MSA after June 21, 2018, when CEO Eblin sent a letter to the Defendant listing the services the Defendant was to provide under the MSA and placing a "yes" beside items that Randolph Health wished to continue and a "no" by those items "we no longer feel we need." (Def.'s SOMF ¶ 68; Eblin Dep. Ex. 22). The Defendant maintains that this letter reflects Randolph Health's waiving of ongoing performance of certain services listed under the MSA and, therefore, precludes any related claim for breach of contract. (Docket No. 115, pp. 17-21).

The MSA provided that, to the extent Randolph Health had the executive positions of CEO, COO, and CFO, those Key Personnel would become employees of the Defendant upon the execution of the MSA, with Randolph Health reimbursing the Defendant for their salaries and benefits. (Def.'s SMF ¶ 29; Pl.'s Ex. 6, § 3(a); Orth June 23 Dep. 19:19-22). The Court observes that both sides have struggled, in

both briefing and arguments, to articulate the precise status of Randolph Health's Key Personnel and the implications of those officers' words and actions. The Defendant argues that the Key Personnel could indeed waive the Defendant's obligations because "they had the apparent and actual authority to act on behalf of, bind, and make decisions for Randolph Health at all relevant times[.]" (Docket No. 120, p. 5 n.11). The Plaintiff counters that the Key Personnel were the Defendant's employees under the terms of the MSA and, as such, could not waive Randolph Health's rights under the agreement. (Docket No. 124, pp. 7-8).

Due to the employment mechanism within the MSA, the Key Personnel, for purposes of agency law, assume the position of a subagent. "A subagent is a person appointed by an agent empowered to do so, to perform functions undertaken by the agent for the principal, but for whose conduct the agent agrees with the principal to be primarily responsible." RESTATEMENT (SECOND) OF AGENCY § 5 (1958). The MSA empowered the Defendant to hire, employ, direct, and instruct the Key Personnel in order to provide the requisite management services to Randolph Health. (Pl.'s Ex. 6, § 3(a)). Although Eblin and Orth operated as the chief executive officers of Randolph Health, they were, at all times under the MSA, employees and subagents of the Defendant.

While a subagent may subject the principal to liability in interactions with third parties, *see* RESTATEMENT (THIRD) OF AGENCY § 3.15, COMMENT B (2006), the subagent's knowledge cannot be imputed to the principal when the subagent is taking actions adverse to the principal's interests. *See* RESTATEMENT (SECOND) OF

AGENCY § 279, Comment A (1958) ("If, in the particular transaction, the person who has knowledge, although an agent in other matters, is not acting or purporting to act on account of the principal, but is acting for himself or for some other person, the principal is not affected by such knowledge."). This caveat assumes critical importance when considering the question of waiver, in which the waiving party must be shown to have been "fully cognizant of his rights, and that being so he neglects to enforce them." *Wheeler*, 263 S.E.2d at 766; *see also* 28 AM. JUR. 2D ESTOPPEL AND WAIVER § 188 (2023) ("An effective waiver presupposes full knowledge of the right or privilege being waived and some act done designedly or knowingly to relinquish it. . . . Ignorance of a material fact negates waiver, and waiver cannot be established by a consent given under a mistake or misapprehension of fact."). As described in Section 1 of the MSA, the Randolph Health Board of Directors was the principal of both its managing agent, the Defendant, as well as the subagents, the Key Personnel. Therefore, the key inquiry, for purposes of determining whether Randolph Health waived potential breaches or any of the Defendant's obligations to perform under the MSA, is whether the Randolph Health Board of Directors possessed the requisite knowledge and intent to waive Randolph Health's rights.

The record, however, contains incomplete and at times conflicting evidence regarding the Board of Directors' involvement in, and ratification of decisions reached by the Key Personnel. There are also disputed questions of fact as to whether the Board ratified or otherwise supported Eblin's representations to the

Defendant that certain services would no longer be required after June 21, 2018. (Eblin Dep. Ex. 22). Although evidence shows that Eblin and Orth presented their positions on the MSA to Randolph Health's Board of Directors, and that Randolph Health ultimately determined it would not terminate the MSA at that time, (Lisk Dep. 51:9-54:18, 56:21-22; Orth June 28 Dep. Ex. 28), the record is similarly lacking in clear evidence that the Board of Directors intended to waive ongoing performance of required services under Section 3.

For these reasons, the Court finds the acts or communications of Key Personnel, standing alone, fail to show the requisite intent by Randolph Health to waive the Defendant's obligations under the MSA for purposes of summary judgment.[9]  The Court further finds that the evidentiary record at this time is not sufficient for the Court to find, as an undisputed fact, that Randolph Health— through its Board—knowingly and intentionally waived prior breaches of Section 3 or the Defendant's prospective obligations to perform certain services under the MSA.

## ii. Notice Under Section 10 of the MSA

The Defendant also argues that Randolph Health's failure to provide the Defendant with any notice of breach under Section 10 of the MSA waived the

---

[9] There is also a genuine issue of material fact as to whether the Key Personnel themselves possessed the requisite intent to waive Randolph Health's rights or the Defendant's obligations under the MSA. Eblin declared that he "did not intend to waive any of Randolph Health's rights under the MSA or amend the MSA by virtue of the June 13, 2018 and June 21, 2018 letters or otherwise. Nor did I believe I could waive Randolph Health's rights or amend the MSA on Randolph Health's behalf, as a Cone Health employee, without approval of the Randolph Health Board of Directors." (Pl.'s Ex. 17, ¶ 17).

Plaintiff's claims for breach of contract. (Docket No. 115, pp. 13-14). Section 10 provided that:

> 10. Termination. A party may terminate this Agreement immediately by delivering to the other party a written notice of termination if the other party commits a material breach of any provision of this Agreement and fails to cure that material breach no later than sixty (60) days after the non-breaching party gives written notice of the material breach to the other party.

(Pl.'s Ex. 6, § 10).

The Defendant's position that Randolph Health's failure to notify under Section 10 necessarily entails a finding that it waived any potential breaches of the MSA is misguided. That section merely governs the procedure for a party's termination of the MSA, providing the other party an opportunity to cure any breach that would be cited as the basis for termination. Randolph Health did not seek to terminate the MSA and the agreement is no longer in effect; the termination procedures are therefore of little relevance to the claims at issue in this proceeding.

Although the absence of any notice sent under Section 10 could be some indication that Randolph Health impliedly waived breaches of the MSA, the record is similarly lacking in evidence that Randolph Health, through its Board of Directors, possessed the requisite degree of knowledge and intent that could support a finding of implied waiver.

### iii. Randolph Health's Ongoing Performance of Obligations

The Defendant further asserts that Randolph Health's ongoing payments to the Defendant for management fees and other expenses, without sending a notice of default, constitutes an implied waiver of any breaches of the MSA. (Docket No. 115,

pp. 13-14). A party may, by continuing to perform or by accepting the partial performance of the breaching party, impliedly waive its contractual rights. *Wheeler*, 263 S.E.2d at 766-67. Although "there is no clear line of demarcation as to what does or does not constitute adequate evidence of waiver by acquiescence[,]" *Tumlin v. Tuggle Duggins P.A.*, No. 15 CVS 9887, 2018 NCBC 129 ¶ 53, 2018 WL 6681367, at *10 (N.C. Super. Ct. Dec. 18, 2018), "courts disfavor implicit waiver of a contractual right." *Heron Bay Acquisition, LLC v. United Metal Finishing, Inc.*, No. 12 CVS 5505, 2014 NCBC 15 ¶ 33, 2014 WL 1878885, at *7 (N.C. Super. Ct. May 7, 2014) (citing *Fairview Devs., Inc. v. Miller*, 652 S.E.2d 365, 369 (N.C. Ct. App. 2007)); *see also* 28 AM. JUR. 2D ESTOPPEL AND WAIVER § 183 (2023) (noting that "waiver is not favored under the law.").

Importantly, the issue of implied waiver is typically a question of fact to be decided by the trial court and "is rarely to be inferred as a matter of law." *Wheeler*, 263 S.E.2d at 766; *see also 42 East, LLC v. D.R. Horton, Inc.*, 722 S.E.2d 1, 7 (N.C. Ct. App. 2012); 13 WILLISTON ON CONTRACTS § 39:21 (4th ed.). "[W]here the evidence concerning waiver, or an element or requisite thereof, is conflicting or disputed, or where more than one reasonable inference may be drawn from the evidence, the question of waiver is one of fact for the trier of facts." 28 AM. JUR. 2D ESTOPPEL AND WAIVER § 211 (2023). Only where the facts are not disputed is waiver a matter of law that is to be determined by the court. *Johnson v. Dunlap*, 280 S.E.2d 759, 762 (N.C. Ct. App. 1981); *Nakell*, 2006 WL 3848697, at *7. Given this legal standard, the Court is unable, for two key reasons, to determine as a matter of law whether

Randolph Health's conduct constitutes implied waiver of the Defendant's potential breaches of the MSA.

First, as with the other bases the Defendant cites for implied waiver, the parties dispute whether Randolph Health knowingly and intentionally waived its rights in continuing to send payments under the MSA. Although Eblin and Orth communicated with the Randolph Health Board of Directors about the Defendant's performance, and Randolph Health ultimately determined not to terminate the MSA at that time, (Lisk Dep. 51:9-54:18, 56:21-22, 60:4-12; Orth June 28 Dep. Ex. 28), the record does not clearly establish what information the Board possessed at any given time, whether it was fully appraised of the Defendant's potential breaches, and whether it intentionally proceeded to fulfill its own obligations under the MSA despite those breaches. Because there are material facts in dispute that bear on the required elements for a finding of waiver, the Court is unable to grant summary judgment for either party on this issue.

Second, the MSA contained a non-waiver provision, which stated as follows:

> 20. Waiver of Breach. This Agreement is to be construed so that a waiver by either party of a breach or violation of any provision of this Agreement does not operate as a waiver of any subsequent breach of the same provision or of any other provision.

(Pl.'s Ex. 6, § 20). North Carolina courts have long recognized and enforced similar provisions. *Heron Bay Acquisition,* 2014 NCBC 15 ¶ 36, 2014 WL 1878885, at *7 (citing *Long Drive Apartments v. Parker*, 421 S.E.2d 631, 634 (N.C. Ct. App. 1992)). As such, even if the evidentiary record supported a finding that Randolph Health's Board of Directors waived an earlier breach of the MSA, the non-waiver provision

within section 20 could still allow the Plaintiff to pursue damages stemming from a

subsequent breach of the MSA. *See Long Drive Apartments*, 491 S.E.2d at 634

(holding that a non-waiver clause in a HUD-approved lease "precludes an automatic

waiver where the landlord has acquiesced to certain past conduct in violation of the

lease agreement."). It is true that a non-waiver provision, as with any other

provision of a contract, may be waived by a non-breaching party. *See 42 East,* 722

S.E.2d at 7; 13 WILLISTON ON CONTRACTS § 39:36 (4th ed.). As with the broader

issue of implied waiver, however, material facts remain in dispute, and the question

of whether Randolph Health waived the non-waiver provision is a question of fact to

be decided at trial. *See 42 East,* 722 S.E.2d at 7.

    As there are genuine issues of material fact precluding any determination on

waiver, and the Defendant has asserted the affirmative defense for each of the

alleged breaches of the MSA, the Court must deny the Plaintiff's motion for

summary judgment as to his breach of contract claim. The Court must similarly

deny the Defendant's motion for summary judgment as to alleged breaches of

Sections 3(m), (o), and (p), in which the Defendant confines its argument solely to

the issue of waiver.[10] The Court will also deny the remainder of the Defendant's

motion on this claim to the extent it relies upon a finding of waiver but will assess

whether the Plaintiff has come forward with sufficient evidence to survive summary

---

[10] Unlike other alleged breaches of Section 3, the Defendant's summary judgment argument as to subsections (m), (o), and (p) is limited to waiver; specifically, the Defendant asserts that Randolph Health waived any potential breaches and declined future performance of the required services through CEO Eblin's June 21, 2018 letter to Cone Health CEO Akin. (Eblin Dep. Ex. 22). The Defendant offered no additional arguments as to these alleged breaches. (Docket No. 115, pp. 11-22).

judgment as to the Defendant's liability on any or all of the remaining nine alleged breaches of the MSA.

>C.    *Alleged Breaches of Section 3 of the MSA*

In its motion for partial summary judgment, the Defendant seeks judgment as a matter of law on nine of the twelve specifically alleged breaches of Section 3 of the MSA: 3(a) (employment of Key Personnel), 3(b) (corporate managerial resources), 3(c) (routine reporting to Board of Directors), 3(e) (administering accounting system), 3(g) (physician recruitment plan), 3(h) (revenue cycle operations), 3(i) (budgeting), 3(k) (personnel issues), and 3(n) (third party claims, governmental permits, and licenses). (Docket No. 115, pp. 17-21).

>i. Section 3(a): Key Personnel

Section 3(a), which concerns the Defendant's employment and direction of the CEO, COO, and CFO, provides that:

> *To the extent Randolph has the following executive positions*, Cone Health shall hire and employ on a full-time basis for Randolph a president and chief executive officer ("CEO"), a chief operating officer ("COO") and a chief financial officer ("CFO"). The CEO, COO and CFO will be referred to collectively as the "Key Personnel." Cone Health shall direct and instruct the Key Personnel in a manner consistent with the purposes of this Agreement… Cone Health may dismiss any of the Key Personnel after first notifying and consulting with the Board and, under the appropriate circumstances, after first implementing a specific plan for improvement for the affected Key Personnel. *If any Key Personnel leaves the employment of Cone Health or is terminated during the Term, then Cone Health shall initiate an executive search process acceptable to the Board and shall arrange for a suitable temporary replacement until a permanent replacement is hired and approved by the Board.*

(Pl.'s Ex. 6, § 3(a)) (emphasis added).

33

Following Marsh's departure in September 2017, the CFO position at Randolph Health went unfilled, with Loretta Long assuming the role of interim CFO for the remaining term of the MSA. (Def.'s SMF ¶¶ 27, 29; Orth June 23 Dep. 88:11-17; Eblin Dep. 137:21-138:24). The Defendant cites language in Section 3(a) that it was only obligated to replace Key Personnel "[t]o the extent Randolph has the following executive positions," arguing that Randolph Health, through its then CEO, Eblin, and COO, Orth, "decided on its own not to replace Mr. Marsh." It "would be absurd," the Defendant maintains, to expect it to employ a CFO "over Randolph Health's objection." (Docket No. 115, p. 18). The Plaintiff, in his rejoinder, points out that the CEO and COO were themselves Cone Health employees under the terms of the MSA "and were the only people involved in the decision to not replace Randolph Health's CFO." (Docket No. 124, p. 12).

The parties do not dispute that the CFO position was left vacant following Marsh's departure. (Orth June 23 Dep. 88:11-17). Long was then appointed as interim CFO and remained in that position on an extended basis, because, according to Eblin, "we thought we were going to merge with Cone." (Eblin Dep. 137:12-15). Although there is no genuine dispute of fact that Eblin and Orth—Cone Health employees for purposes of the MSA—determined not to seek a permanent CFO to replace Marsh,[11] the question of the Defendant's liability turns on whether

---

[11] When asked whose decision it was not to hire a CFO to replace Marsh, Eblin responded that "[i]t was primarily Angie and me. But we did consult our colleagues from Cone …" (Eblin Dep. 137:21-25). When asked whether anyone other than Eblin and Orth was involved in making that decision, Cone Health's chief strategy officer, Roskelly, replied "I'm unaware of anyone else." (Roskelly Dep. 92:22-25).

it was required to fill the position. Unlike other subsections, the Defendant need not rely on the affirmative defense of waiver; rather, the express language of Section 3(a) itself allows for a scenario in which Key Personnel positions could be left vacant for a protracted period so long as the Randolph Health Board of Directors found the proposed "executive search process acceptable[.]" On those subsections in which the Defendant is the moving party and bases its argument on the affirmative defense of waiver, it carries the burden and must make a greater showing to obtain judgment as a matter of law. *Ohio Valley Envtl. Coalition v. Foal Coal Co., LLC*, 274 F. Supp. 3d 378, 384 (S.D. W.Va. 2017) ("'[W]here the moving party has the burden—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.'") (internal citations omitted); *Plyler v. Cox Bros., Inc.*, No. 3:22-CV-00413, 2023 WL 5310579, at *4 (W.D.N.C. Aug. 17, 2023) ("In order for a defendant to prevail on a summary judgment motion based on an affirmative defense, the defendant must shoulder the burden usually allocated to a plaintiff moving for summary judgment[.]") (internal citations omitted). In this instance, however, the Defendant is not asserting an affirmative defense, instead alleging that the Plaintiff fails to show sufficient evidence of a breach of Section 3(a). The Plaintiff, therefore, retains the burden, and summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his case and does not make, after adequate time for discovery, a showing

sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

To avoid summary judgment as to this aspect of his breach of contract claim, the Plaintiff "must present sufficient evidence to allow reasonable jurors to find [he] has proven [his] claims by a preponderance of evidence," *Jones v. United Health Grp., Inc.*, 802 Fed. Appx. 780, 781 (4th Cir. 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). And although the Court must "view all reasonable inferences drawn from the evidence in the light that is most favorable to the non-moving party," *Smith v. Collins*, 964 F.3d 266, 274 (4th Cir. 2020) (quoting *Nader v. Blair*, 549 F.3d 953, 958 (4th Cir. 2008)), "[p]ermissible inferences must still be within the range of reasonable probability … and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." *CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647 (4th Cir. 2020) (quoting *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 241 (4th Cir. 1982)).

The plain language of Section 3(a) provides that Marsh's departure triggered the Defendant's obligation to initiate a search process to fill the position. While the Defendant did not actively seek out and employ a permanent CFO, instead leaving Long in place on a temporary basis, the language of subsection (a) provides the parties with flexibility in determining the timeframe by which a permanent

replacement would be hired. After a vacancy among the Key Personnel was created, the Defendant was responsible for formulating and initiating an executive search process, but the section is notably silent on its parameters. Importantly, the section offers no additional guidance regarding the timing of the hiring search or the deadline by which a permanent replacement must be hired.  Instead, the nature and sequencing of the "executive search process" is left to the discretion of the Defendant and the Randolph Health Board of Directors so long as the Defendant's process is "acceptable to the Board."

After viewing the record in the light most favorable to the Plaintiff, the Court finds that, at best, the Plaintiff has only raised "some metaphysical doubt" regarding Randolph Health's approval of the Defendant's executive search process for the CFO position. Although Eblin stated that the Board of Directors was not consulted in making the determination not to replace the CFO position, he did inform them after the fact:

> Q: Okay. And the board approved the recommendation from you and Angie not to replace Mr. Marsh with a full-time –
> A:  We didn't formally take that to the board.
> Q: You did not?
> A: No.
> Q:  Okay.
> A: Not that I remember. I mean, we told them, but I don't think it was in a request for approval fashion.
> Q: Okay. But the decision ultimately was made between you and Angie together?
> A:  Ultimately, yes.

(Eblin Dep. 138:9-24).

Orth similarly did not recall involving the Board in the decision not to fill the CFO position, but her testimony was that the Board was both aware of and "in step with" that approach:

> Q: Was the board aware of the decision to not seek a CFO replacement?
> A: Yes, yes.
> Q: And did they approve of that decision or that approach?
> A: I do not recall asking them their opinion about that. I don't remember a deliberate discussion about that. We had regular finance committee meetings which we called fair committees, committee and they were in step with me along the way.

(Orth June 28 Dep. 104:24-105:9). Orth confirmed in further testimony that there was also never a scenario in which she requested a new CFO and the Defendant declined. (Orth June 24 Dep. 99:6-20).

The Defendant's then CEO, Akin, testified that "I remember Steve [Eblin] communicating that decision [to not rehire the CFO position]. I remember being in a board meeting where it was discussed and affirmed." (Akin Dep. 45:10-19). Speaking as the Rule 30(b)(6) designee, the Plaintiff himself stated that, "I would say that based on the process [described in the MSA], the board was advised [of that decision not to replace the CFO] … [and] I would think I would have to say that the board did a—did approve that decision." (Robichaux Dep. 137:23-139:6).

The evidentiary record similarly does not contain minutes or other evidence clearly showing the Board was unaware of, or disapproved of, Orth and Eblin's determination not to permanently replace the CFO position. The testimony of Lisk, the only Board member whose deposition is in the record, generally aligns with

Eblin and Orth's statements that the Board did not make the decision, but

ultimately knew and concurred with that choice:

> Q: What was the board's involvement, if any, in Loretta Long replacing Mr. Marsh as CFO?
> A: There was no involvement.
> Q: Was that a decision that the board was made aware of at some point in time?
> A: Well, obviously, I mean, Loretta worked underneath Skip, but she was the logical person to step up into that role.
> …
> Q: And Ms. Long became interim CFO; is that correct?
> A: I believe so.
> Q: Was the board ever made aware of why Ms. Long was interim CFO instead of just CFO?
> A: I don't recall that.
> …
> Q. Okay. And do you recall whether any person on the board expressed any kind of concern around Ms. Long becoming the interim CFO?
> A. I do not.

(Lisk Dep. 23:3-24:17).

Given the record before it, the Court finds the Plaintiff "has failed to make a

sufficient showing on an essential element of [his] case with respect to which [he]

has the burden of proof." *Celotex Corp.*, 477 U.S. at 323. Despite evidence that Eblin

and Orth did not initially consult the Board in determining not to seek a permanent

replacement for the CFO position, the Plaintiff does not come forward with evidence

demonstrating that the Board found the decision unacceptable. Rather, the evidence

in the record tends to show the Board's knowledge and approval of that approach.

Drawing all inferences in the favor of the Plaintiff, the Court is unable to infer that

the Board of Directors found the Defendant's search process unacceptable or found

Long to be an unsuitable temporary replacement, as such an inference is not

"within the range of reasonable probability" and "is so tenuous that it rests merely upon speculation and conjecture." *CTB,* 954 F.3d at 658 (quoting *Lovelace,* 681 F.2d at 241). Accordingly, the Court finds the Defendant is entitled to judgment as a matter of law on this aspect of the Plaintiff's breach of contract claim and will grant the Defendant's motion for partial summary judgment as to the alleged breach of Section 3(a).

### ii. Section 3(b): Corporate Managerial Resources

Section 3(b) directs the Defendant to broadly provide "corporate managerial resources" necessary to fulfilling the services under the MSA:

> Cone Health *shall provide to Randolph the Cone Health corporate managerial resources that are necessary to provide management services under this Agreement, which will be provided at the request and under the direction of the CEO or his designee.* Randolph and Cone Health may agree for Cone Health to provide additional consulting or project-specific services that are not included in this Agreement. At the request of Randolph, Cone Health shall provide such additional services to Randolph pursuant to the fees, scope and other terms and conditions of the provision of such services as may be mutually agreed upon by the parties.

(Pl.'s Ex. 6, § 3(b)) (emphasis added).

The Plaintiff argues that the Defendant did not adequately manage Randolph Health during the term of the MSA, pointing particularly to the absence of any specific actions taken by the Defendant to address Randolph Health's severe financial distress. (Docket No. 124, pp. 12-13). The Defendant maintains that it provided all requested and required managerial resources and the Plaintiff, through Randolph Health's actions and the communications of its leadership team, otherwise waived any claim for breach of Section 3(b). (Docket No. 115, p. 19).

The Plaintiff relies, in large measure, on testimony from Key Personnel as to deficiencies in managerial support from the Defendant. Orth identified the service as only partially fulfilled in the January 2019 MSA Overview. (Orth June 23 Dep. 108:13-19). Specifically in terms of grappling with Randolph Health's growing insolvency, Orth could not recall the Defendant providing any financial or managerial input for dealing with cash preservation or financial distress. (Orth June 23 Dep. 93:12-22). The testimony and communications from the CEOs suggest a declining level of support from the Defendant after the entry into, and eventual demise of, the LOI. Eblin reported that, after entering into the LOI, "[Cone Health] stopped being our manager and started being our acquirer . . . [b]ecause all we talked about was the merger and not our day-to-day operations." (Eblin Dep. 111:7-13). In emailed notes to herself in January 2019, months after the LOI was terminated, Orth wrote that "[w]e are not receiving any support for leadership oversight. I do not participate in any meetings with Cone Health and it is very irregular that I meet with a line leader or C suite leader regarding RH's performance." (Orth June 23 Dep. Ex. 13).

The Defendant asserts that it provided all services requested by Randolph Health, or otherwise required, under Section 3(b). Roskelly testified that he believed the Defendant generally provided sufficient corporate managerial resources, asserting that it worked through the Randolph Health leadership team to address challenges around financial distress and there was no "specified documented expressions of discontent or dissatisfaction by Randolph Health." (Roskelly Dep.

48:18-49:3, 93:7-23). The language of subsection (b) does stipulate that the required corporate managerial resources "will be provided at the request and under the direction of the CEO or his designee." (Pl.'s Ex. 6, § 3(b)). There is conflicting evidence as to whether Eblin or Orth identified managerial resources that Randolph Health required that were not provided by the Defendant. When asked whether she could identify a time where Randolph Health asked for anything encompassed by the MSA relationship and was denied such request by the Defendant, Orth said simply "I'm not able to come up with anything." (Orth June 24 Dep. 98:23-99:5). Eblin, by contrast, identified a lack of managerial support from the Defendant despite expressing his concerns to its leaders:

> A: I didn't feel like we were getting again, other than data requests, I didn't feel like we were getting much management support from Cone other than I was Cone's employee to run Randolph as was Angie as was Skip. But in terms of any real value add at the time, it was more about spewing out data than it was getting a lot of management support.
> Q: Okay. Did you ever express that to anyone at Cone?
> A: Yes.
> Q: Who did you express that to?
> A: Terry Akin, possibly Jim [Roskelly].

(Eblin Dep. 43:15-44:1).

The parties further dispute the specific types of services that would be encompassed by the phrase "corporate managerial resources." The Defendant argues that the Plaintiff is improperly extending the language of Section 3(b) to include services not contemplated by the parties as part of the MSA, such as insolvency expertise, (Docket No. 120, p. 6), but the Plaintiff maintains that "even if the MSA does not contemplate comprehensive services, it certainly requires *some*

management." (Docket No. 124, p. 12) (emphasis original). The precise nature of what "corporate managerial resources" must be provided under Section 3(b) is determined, in large measure, by the MSA's performance standard, i.e., what is the scope of corporate managerial resources an independent management company contracting at arm's length would provide. As stated above, *see* supra section 1(A), the meaning and application of the performance standard is in dispute and requires further factual development at trial to allow the Court to determine whether the Defendant satisfied its obligations under Section 3(b). There are also material facts in dispute as to whether the Defendant provided all required corporate managerial resources and whether it unjustifiably failed to respond to requests from Key Personnel for additional assistance.

### iii. Section 3(c): Reporting to Board of Directors

Section 3(c) concerns the frequency and manner in which the Defendant was to communicate its performance as manager under the MSA to its counterparty, Randolph Health:

> At the regular meetings of the Board, Cone Health shall report on the progress and results of actions taken in furtherance of this Agreement. Cone Health shall provide information reasonably requested by the Board for the purpose of assisting the Board to discharge its duties on behalf of Randolph. Prior to each regular Board meeting, Cone Health shall distribute to the Board members written summaries of the information that Cone Health will present at the Board meeting. Cone Health will inform the Board regarding negotiations of contracts that are likely to have a material effect on Randolph.

(Pl.'s Ex. 6, § 3(c)).

The parties appear to agree, and the evidence reflects, that the Defendant representatives did attend the Randolph Board meetings consistently in the early stages of the MSA. But the Plaintiff argues, based on the testimony and views of Orth, that over time, the Defendant stopped attending Randolph Health Board of Directors meetings consistently and failed to provide information mandated by Section 3(c). (Docket No. 124, p. 13; Docket No. 112, p. 7). Orth changed her view of the Defendant's performance under subsection (c) in the January 2019 MSA Overview, explaining that "Cone was not providing routine updates to the board any longer" and was no longer attending "consistently." (Orth June 28 Dep. 154:2-12); *see also* (Orth June 28 Dep. Ex. 20) (compare letter to Board members showing that Akin would be attending the meeting on May 22, 2018 to the Board minutes for April 17, 2018, which does not indicate the presence of any representative for the Defendant). In his testimony, Lisk, a Randolph Health Board member, confirmed that the Defendant was present at every board meeting in the initial phase of the MSA, but he was uncertain whether that presence continued until the sale of the hospital and the eventual termination of the MSA. (Lisk Dep. 25:11-27:19).

The Defendant contends that any deviation from its consistent early performance only occurred after June 21, 2018, when Eblin indicated that Randolph Health no longer wanted the Defendant to report as contemplated by Section 3(c). (Docket No. 115, p. 19). Akin testified as much, stating that "the only time I don't remember that occurring was really at their request, which became really cemented, I would say, after we -- after we demurred on the Letter of Intent or

terminated the Letter of Intent and they subsequently, effectively kind of dismissed us from their strategic dialogue and consideration in their board meetings." (Akin Dep. 47:8-14). While Eblin may have indicated that "Financial Reporting through CFO" was no longer needed (Eblin Dep. Ex. 22), the Court is unable to find, for the reasons explained above, that Randolph Health's Board of Directors knowingly and intentionally waived the Defendant's obligation to perform under Section 3(c).

There is also a disputed question as to whether the Defendant submitted reports in compliance with Section 3(c) and whether that reporting met the MSA performance standard. When asked what the Defendant provided to Randolph Health Board members, Lisk struggled to identify anything of substance. (Lisk Dep. 27:20-28:17). Orth stated that she "reported to the board on a regular basis, at board meetings, at committee meetings. . . . [But] [t]here was not a formal report from a Cone c-suite leader to the [Randolph] board. I made reports to the board." When asked whether the Defendant provided any guidance or input in connection with her reports to the Randolph Board of Directors, Orth answered "No, not that I could recall." (Orth June 23 Dep. 109:5-110:1). The Plaintiff's expert expressed her opinion that the Defendant's efforts in reporting to the Randolph Health Board were inconsistent with standard healthcare industry practice and the performance standard contained within the MSA. (*See* Pl.'s Ex. 13, Expert Report of Waltko, pp. 13-14).

The Court finds, therefore, that the Plaintiff has produced sufficient evidence to create genuine issues of material fact as to what reporting the Defendant

submitted, what the applicable performance standard was for that reporting, and whether the Defendant met the MSA's standard. Accordingly, the issue of whether the Defendant breached Section 3(c) must be determined at trial.

<u>iv. Section 3(e): Accounting System</u>

Section 3(e) describes the Defendant's responsibilities for administering the Randolph Health accounting system:

> Cone Health, *through the CFO and other Randolph financial executives*, shall administer Randolph's accounting system. Monthly, *the CFO shall prepare or cause to be prepared* unaudited balance sheets and statements of operations after the close of each month. Cone Health shall cooperate in the preparation of an annual financial report audited by an independent public accounting firm selected and retained by Randolph.

(Pl.'s Ex. 6, § 3(e)) (emphasis added).

The alleged breach of subsection (e) is closely connected to the alleged breach of subsection (a) regarding the Defendant's purported failure to employ a replacement CFO after Marsh vacated his position. The Plaintiff alleges that the Defendant's failure to fill the CFO position precluded its ability to fully comply with its requirements in subsection (e) to administer Randolph Health's accounting system and to provide financial reporting through the CFO. (Docket No. 112, p. 7). In contrast, the Defendant repeats its prior argument that Randolph Health determined not to replace Marsh, so the absence of a permanent CFO does not necessitate a finding that the Defendant was in breach of its duties regarding the accounting system. (Docket No. 115, p. 20).

The evidence upon which the Plaintiff relies to show a breach of Section 3(a) is similarly centered on the Defendant's purported failure to seek out and employ a

permanent replacement CFO. In the January 2019 MSA Overview, Orth identified

the service as not fulfilled, remarking that "Loretta (Interim CEO) is not a Cone

employee and has been serving in this capacity since September 2017." (Orth June

28 Dep. Ex. 34). Orth explained her reasoning in her first deposition:

> A: It says Cone Health through the CFO and other Randolph financial
> executives shall administer Randolph's accounting system. So Randolph had
> its own accounting system which was through Meditech. Monthly reports
> were generated through Meditech by the Randolph Health CFO Loretta Long
> who was a Randolph Health employee.
> Q. Did Cone Health administer the Meditech accounting system?
> A: No.
> Q: Did Cone Health prepare the financial reporting that Loretta
> administered?
> A: Loretta prepared that.
> Q: Not Cone?
> A: Not Cone. She shared those documents with Cone.

(Orth June 23 Dep. 110:20-111:11).

As an initial matter, the Court observes that subsection (e) clearly

contemplates the involvement of Randolph Health financial executives, such as

Long, in the administration of the accounting system. Further, the Court reiterates

its conclusion from subsection (a) that, following Marsh's departure, Eblin and Orth

declined to immediately seek a permanent CFO and left Long in place as interim

CFO, presuming that Randolph Health and the Defendant would successfully

complete an envisioned integration. The testimony and documentary record show

that the Randolph Health Board of Directors was aware of and approved that

decision; the Plaintiff has not pointed to any evidence that the Board disagreed or

requested an alternative approach.

Because the Defendant's actions regarding the CFO position did not constitute a breach Section 3(a), the Court similarly finds that the absence of a permanent CFO does not necessitate a finding that the Defendant failed to fulfill its accounting duties under subsection (e). Regardless of the duration, Long's role as interim CFO was acknowledged and approved by the Randolph Health Board of Directors and adopting the Plaintiff's position, i.e. that *any* absence of a permanent CFO entails a near-automatic breach of subsection (e), requires the Court to interpret the MSA in a manner that would lead to an unreasonable and absurd result.[12] *See Jarman v. Twiddy & Co. of Duck, Inc.*, 889 S.E.2d 488, 498 (N.C. Ct. App. 2023) (citing *Atl. Disc. Corp. v. Mangel's of N.C., Inc.*, 163 S.E.2d 295, 299 (N.C. Ct. App. 1968)) ("A construction of a contract leading to an absurd, harsh or unreasonable result should be avoided if possible."). The Court declines to interpret the language in such a manner and, because the Plaintiff provides no other arguments or evidence that the Defendant failed to fulfill its accounting duties under subsection (e), will grant the Defendant's motion for summary judgment as to this alleged breach.

---

[12] Extending the Plaintiff's argument to its logical conclusion would mean that, regardless of the Randolph Health Board of Directors' approval of an executive search process, the presence of an interim CFO for any length of time would render the Defendant unable to satisfy its accounting responsibilities under subsection (e). Under this rationale, the Defendant would have been in breach within a month of Marsh's departure once Long submitted her first monthly reports. The Court finds that the parties could not have intended such a result where Section 3(a) of the MSA specifically allows for a "suitable temporary replacement" for the CFO.

<u>v. Section 3(g): Physician Recruitment</u>

Section 3(g) succinctly sets forth the Defendant's requirement to develop a physician recruitment plan:

> Cone Health will oversee the development, by a third-party consultant or otherwise, of a physician recruitment plan for Randolph, subject to appropriate Board oversight and approval.

(Pl.'s Ex. 6, § 3(g)).

The parties vigorously dispute the scope of the Defendant's obligation under subsection (g) and whether it satisfied that obligation and the MSA's performance standard. Although the parties agree that the Defendant, contracting through third-party Ascendient Health, created a provider needs document for Randolph Health, the parties dispute whether this service satisfied Section 3(g)'s requirement to develop "a physician recruitment plan for Randolph." Orth marked the section as unfulfilled on the January 2019 MSA Overview, under the following reasoning:

> A: So a recruitment assessment was completed and a copy was given to me by Ascendant Health. There was no real subsequent action beyond the development of the document itself that I recall.
> Q: The Ascendent assessment identified the needs. There was never a plan of how to address those needs, was there?
> A: I do not recall a plan being developed.

(Orth June 23 Dep. 111:12-23).

Barbara Wolfe, the Vice President of Operational Organization and Strategy at Randolph Health, stated that "[m]y perception is that we had a physician manpower plan. We did not have a physician recruitment plan." Wolfe explained that the "manpower plan" is "a needs analysis. It's a provider needs analysis, which is a long-term document. It is not a year-by-year recruitment plan." (Wolfe Dep.

85:24-86:17). The Plaintiff also points to an email directed to Roskelly from the Defendant's director of physician recruitment, Rebekah Driggers, in which she notes that "[a]t this time [June 15, 2018], we have not done any formal recruiting for them yet. We gave [sic] been waiting on the green light on this. Please advise when/if we need to move forward with helping them with their recruitment." (Roskelly Dep. Ex. 7).

Although Orth and Wolfe maintain that no recruitment plan was developed, the Defendant's leaders assert that the Ascendient plan satisfied its obligations under Section 3(g). Roskelly observed that the Ascendient needs document "was certainly the basis for a plan" and "could have been developed I assume into a more actionable, time limited approach with specific steps and accountabilities." Roskelly, however, was not aware of whether such a follow-up plan was developed in collaboration with Randolph Health's executive team. (Roskelly Dep. 94:23-95:15). Nevertheless, the Defendant does cite to Eblin's June 21, 2018 letter to Akin, in which he states that the development of a physician recruitment plan was "already complete" and Randolph Health no longer required performance under Section 3(g). (Eblin Dep. Ex. 22).

The parties also dispute whether, and to what extent, subsection (g) required the Defendant to recruit physicians on Randolph Health's behalf. The Defendant argues that the MSA only required it to oversee the development of a plan and did not impose a duty "to implement or provide resources to Randolph Health to fulfill needs in connection with a recruitment plan." (Docket No. 120, p. 8). In contrast, the

Plaintiff argues that further evidence of the Defendant's breach is its failure to provide resources or a plan to Randolph Health on how it could fill its physician needs. (Docket No. 112, p. 7). The evidence in the record does not clarify how the parties viewed the Defendant's recruiting responsibilities. Eblin, for instance, implies that Randolph Health expected recruiting assistance from the Defendant, noting in a letter on June 13, 2018 to Akin that that "[o]ver a year ago, our Physician Recruitment Coordinator accepted another job. We encouraged her to do so, as the MSA document calls for physician recruitment assistance from Cone Health. Due to a lack of resources at Cone, that has not occurred, resulting in Randolph Health paying an expensive search firm which is never as effective as 'local' recruitment." (Eblin Dep. Ex. 21). Orth, however, implies in her testimony that Randolph Health controlled its own recruitment efforts and actually "stopped its recruiting function at some point while [she] was there. Randolph Health made that decision due to the circumstances that we were in knowing that it would be very difficult[.]" (Orth June 23 Dep. 54:14-21).

The Defendant is correct that, unlike other subsections of the MSA, Section 3(g) only requires it to oversee the "development" of a plan rather than develop and "implement" the plan. *Compare* Pl.'s Ex. 6, § 3(g) *with* § 3(h). Nevertheless, the Plaintiff has come forward with evidence raising a genuine dispute as to whether the MSA performance standard for the development of a recruitment plan entails a long-term "manpower plan," a more narrowly tailored year-by-year recruitment plan, or some manner of follow-up and devotion of resources to assist Randolph

Health in implementing such a plan.[13] Therefore, the Court requires further evidence at trial to determine the MSA performance standard for Section 3(g) and whether the Defendant's efforts satisfied its obligations under that subsection.

### vi. Section 3(h): Revenue Cycle Operations

Section 3(h) describes the Defendant's duty to monitor and improve Randolph Health's revenue cycle operations:

> Cone Health will provide a comprehensive review of Randolph's revenue cycle operations and will develop and implement an improvement plan to enhance the accuracy and efficiency of such operations. The Board, and not Cone Health, retains responsibility for establishing Randolph rates and charges at a reasonable level in consideration of competition, mission, financial obligations, anticipated capital needs and the costs of providing quality health care. Cone Health may provide charge master review and related management services for Randolph for a separate fee.

(Pl.'s Ex. 6, § 3(h)).

The Plaintiff claims that, despite initial assistance offered after the effective date of the MSA, the Defendant abandoned its responsibilities regarding Randolph Health's revenue cycle operations. (Docket No. 124, p. 14). The Defendant counters that Randolph Health never reported any deficiencies in the Defendant's

---

[13] If, at trial, the Court determines that Section 3(g) required the Defendant to actively support Randolph Health's recruitment efforts, the parties further dispute whether the Defendant satisfied such a requirement. Driggers testified that she did receive "business plans" to recruit and fill certain physician positions through the HR system, including for hospitalists in Randolph County. However, her testimony lacks clarity as to whether such recruitment was primarily for the benefit of Randolph Health or the Defendant. (Driggers Dep. 25:25-27:13). The parties also dispute whether the Defendant used its position as manager, and Randolph Health's financial distress, to recruit physicians to its own system and away from Randolph Health. *See* Orth June 23 Dep. Ex. 13 ("RH identified a number of physicians that would be ideal for CH to recruit, assuming that RH would become its integration partner. The Defendant reached out to many of these physicians. Many of those physicians are at risk of leaving our community due to Cone's contact."); *see also* Akin Dep. 38:1-22 ("But I recall being on the phone with Steve, personally on the phone with Steve and with Angie multiple times and with our physician recruitment people multiple times saying let's strike the right balance here, because whatever we do needs to support and help that community and be compatible and consistent with what Randolph Health is trying to accomplish.").

performance and indicated it was satisfied with the revenue cycle support it received. (Docket No. 115, p. 20). Specifically, Roskelly stated his belief that the Defendant provided all services required under Section 3(h), noting the collaboration between Randolph Health and the Defendant's revenue cycle executive. (Roskelly Dep. 95:16-24). And Eblin's letter to Akin on June 13, 2018 indicates that revenue cycle was an "area where we have consistently gotten great support." (Eblin Dep. Ex. 21).

The Plaintiff produces countervailing evidence, however, showing that the Defendant's support fell off significantly during the later stages of the MSA. As reflected in emailed notes to herself in preparation for seeking an MSA fee reduction, Orth remarked that "[t]here was initial support from revenue cycle, however, the support was limited to a very initial engagement to improve collections which quickly dissipated." (Orth June 23 Dep. Ex. 13). Interim CFO Long similarly testified that the Defendant did assist initially with revenue cycle work, but curtailed that help once the LOI was terminated:

> A: [The Cone Health revenue cycle executive] and his team -- they came down when we started the agreement and assisted, and then once Cone decided not to acquire or work with Randolph, they ended up pulling out, and so they stopped helping us at that point.
> Q: So the agreement for revenue cycle ended at some point in time; is that right?
> A: The agreement did not end. They just stopped. Cone decided that they weren't going to move forward with Randolph. I don't know if that was their direction or what, but they did. They stopped assisting us at that point.
> Q: So the agreement was still in place, but Cone had stopped assisting you. Is that what you're saying?
> A: Yes. They stopped assisting us.

(Long Dep. 43:1-16).

According to Orth, Randolph Health's restructuring adviser, Ankura Consulting Group, stepped in to assist on revenue cycle. Through an email to Randolph Health's in-house counsel, Orth explained that "Cone Health abandoned the revenue cycle project mid stream. Ankura stepped in and assisted RH." (Orth June 24 Dep. Ex. 17). In the January 2019 MSA Overview, Orth marked the section as partially satisfied, explaining that "[p]artially I think is accurate from the perspective of that under the second margin improvement plan that the denial work was managed by the local Randolph team in collaboration with Ankura consultants." (Orth June 23 Dep. 112:24-113:6).

The Plaintiff has produced sufficient evidence to create material facts in dispute regarding what services Cone Health provided for revenue cycle management and whether those actions satisfied the MSA performance standard.

### vii. Section 3(i): Annual Budgets and Cash Flows

Section 3(i) outlines the Defendant's responsibilities in creating and submitting annual budgets and cash flow projections:

> In accordance with the budget planning cycle of the Board as communicated to Cone Health, Cone Health shall submit to the Board for approval an annual consolidated operating budget, an annual consolidated capital expenditures budget and annual consolidated cash flow projections (together, the "Annual Budgets"), all designed to meet the goals and objectives of Randolph as determined by the Board. At the Board's direction, Cone Health will prepare appropriate revisions to the Annual Budgets. After the Board approves the Annual Budgets, Cone Health may proceed with capital expenditures contemplated in the Annual Budgets without further Board approval. If the Board modifies the Annual Budgets by resolution, then the Annual Budgets as modified by the Board, as of the date of modification by the Board, will be deemed to constitute authorization to Cone Health for expenditures during the remainder of the fiscal year.

(Pl.'s Ex. 6, § 3(i)).

The Defendant maintains that the representations made by Randolph Health's leadership team show that it was fulfilling its obligations under Section 3(i) until June 2018 when Randolph Health indicated it no longer desired any ongoing performance. The June 2018 MSA Overview reflects that the Defendant was satisfying its obligations under Section 3(i), (Orth June 28 Dep. Ex. 22), and, in a May 2018 email responding to Eblin's inquiry about the Defendant's performance under the MSA, Long replied that "[t]he Finance areas are fully supported." (Eblin Dep. Ex. 18). Randolph Health, according to the Defendant, then declined any future performance of the services after June 2018, when Eblin informed Akin that Randolph Health no longer needed the Defendant to prepare operating and capital budgets under Section 3(i). (Eblin Dep. Ex. 22).

The Court finds that the Plaintiff has produced sufficient evidence to create a genuine factual dispute as to whether the Defendant was meeting its obligations regarding budgeting. Specifically, the January 2019 MSA Overview shows that Orth's view of the Defendant's performance under Section 3(i) was "N/A" rather than fulfilled; Orth explained that "Randolph Health was providing all of the income statements, cash flow, balance sheet on their own. What Cone was doing was preparing a monthly analysis of deductions from revenue." (Orth June 28 Dep. 156:5-17). There is conflicting evidence, therefore, about whether the Defendant was providing sufficient services under Section 3(i) and whether Randolph Health

intentionally waived the Defendant's budgeting and cash flow obligations after June 2018.

viii. Section 3(k): Personnel Policies

Section 3(k) explains the Defendant's duties regarding Randolph Health's personnel policies:

> On behalf of Randolph, Cone Health shall enforce, administer and implement all Randolph personnel policies, including policies regarding recruiting, hiring, promoting, disciplining and discharging Randolph employees. The Key Personnel are employees of Cone Health, and all other Randolph employees are and remain the employees of Randolph.

(Pl.'s Ex. 6, § 3(k)).

The Defendant asserts that the Defendant's obligations under Section 3(k) were fully satisfied throughout the duration of the MSA. Akin recalled that there was "a point person at Randolph for human resources with whom our human resources team worked closely and collaboratively and as needed in an advisory capacity." (Akin Dep. 50:9-21). The June 2018 MSA Overview reflects that Cone Health was fulfilling its obligations under Section 3(k). (Orth June 28 Dep. Ex. 22). Eblin's letter to Akin on June 13, 2018 further states that human resources was an area "where we have consistently gotten great support." (Eblin Dep. Ex. 21).

The Plaintiff, however, points to the January 2019 MSA Overview, which changed subsection (k) to "partial" fulfillment. (Orth June 28 Dep. Ex. 34). Orth explained that Randolph Health was fulfilling most of the services itself without the assistance of the Defendant:

> A: Cone Health, the MSA states that Cone will enforce, administer all Randolph personnel policies. Randolph had its own personnel policies.

> Randolph Health consulted with Cone Health occasionally about personnel matters, but Randolph Health operated under its own personnel policies. In terms of discharging employees, for the most part Randolph Health made decisions about that independently. There were occasions where we might ask for some guidance from the HR team which they would supply guidance to us.

(Orth June 23 Dep. 113:15-114:1).

There are disputed issues of material fact as to what specific services the Defendant was required to provide in fulfilling its obligation to "administer and implement" Randolph Health's personnel policies and whether it ultimately fulfilled its duties under Section 3(k). There also remains a question of whether the services rendered by the Defendant satisfied the MSA performance standard, which requires further evidentiary development at trial.

### ix. Section 3(n): Third-Party Claims, Governmental Permits, and Licenses

Section 3(n) defines the Defendant's duty to support Randolph Health with respect to third-party payer claims, governmental permits, licenses, and accreditation:

> On behalf of Randolph, Cone Health shall pursue and support Randolph's best interests with respect to third-party payer claims and reports, governmental permits and licenses required for the operation of Randolph, and accreditation inspections by The Joint Commission, the State of North Carolina and other appropriate accrediting bodies.

(Pl.'s Ex. 6, § 3(n)).

The Defendant believes that it performed all that was required under Section 3(n). Although lacking in specifics, Akin insisted that the Defendant provided the services and that Randolph Health never identified an issue that the Defendant failed to resolve. (Akin Dep. 51:3-15). Roskelly similarly testified that "[w]e provided

assistance through our managed care contracting group … to the extent we were legally able to do so." (Roskelly Dep. 97:6-20). The Defendant also points to the fact that Randolph Health's June 2018 MSA Overview identified the service as "fulfilled" as of June 2018.

The Plaintiff, however, points to countervailing evidence, such as the January 2019 MSA Overview, in which Orth marked the service as not fulfilled; Orth testified that Cone performed some, but not all of the services detailed in subsection (n), adding that "[Cone Health] helped us with our accreditation under the joint commission, and when we had DSHHR visits they actively participated, but … Cone did not help us, to my knowledge, with third-party payer relationships." (Orth June 23 Dep. 114:23-115:7). When asked why her view of the Defendant's performance under Section 3(n) changed from the June 2018 MSA Overview, Orth replied that

> A: There was not a lot of work that was going on with payer, with revenue cycle. Government permits and license, that piece continued from the perspective of Joint Commission conditions of participation under the medical programs. So some of that support continued, but I would say that this changed because of the bill, of billing that we just -- Randolph wasn't getting support for billing.

(Orth June 28 Dep. 157:6-18).

The Court again finds that the Plaintiff has produced evidence sufficient to create genuine disputes of material fact regarding the Defendant's performance under Section 3(n) that require creditability determinations and further evidentiary development at trial.

## 2. Breach of the Implied Covenant of Good Faith and Fair Dealing

The parties each seek judgment as a matter of law on the Plaintiff's claim for breach of the implied covenant of good faith and fair dealing. In addition to its express provisions, every contract contains "an implied covenant of good faith and fair dealing," which requires that "neither party will do anything which injures the right of the other to receive the benefits of the agreement." *Bicycle Transit Auth., Inc. v. Bell*, 333 S.E.2d 299, 305 (N.C. 1985) (internal citations omitted). "It is a basic principle of contract law that a party who enters into an enforceable contract is required to act in good faith and to make reasonable efforts to perform his obligations under the agreement." *Weyerhaeuser Co. v. Godwin Bldg. Supply Co.*, 253 S.E.2d 625, 627 (N.C. Ct. App. 1979). The implied duty of good faith "concerns the parties' performance of obligations under the agreement, not the terms selected for the agreement." *Hancock v. Americo Fin. Life & Annuity Ins. Co.*, 378 F. Supp. 3d 413, 432 (E.D.N.C. 2019) (citing *Bicycle Transit*, 333 S.E.2d at 305)). The North Carolina Business Court recently summarized the purpose and scope of the implied covenant:

> The implied covenant of good faith and fair dealing has been called the "spirit of the contract." *Bicycle Transit*, 333 S.E.2d at 305; accord *Allen v. Allen*, 301 S.E.2d 514 (1983). A material term, the implied covenant is the gap-filler that guides the parties in the performance of the express terms of the contract. *Howard v. IOMAXIS, LLC*, No. 18 CVS 11679, 2022 NCBC 76 ¶41, 2022 WL 17451249, at *6 (N.C. Super. Ct. Dec. 5, 2022). "Evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance may constitute breach of the implied covenant." RESTATEMENT 2D OF CONTRACTS § 205 cmt. d (1981).

*Intersal, Inc. v. Wilson*, No. 15 CVS 9995, 2023 NCBC 15 ¶ 145, 2023 WL 2193851, at *25 (N.C. Super. Ct. Feb. 23, 2023).

"Under North Carolina law, a claim for breach of the implied covenant is separate from a traditional breach of contract claim if there are distinct factual bases for the two claims and the express terms of the contract do not preclude the implied terms purportedly breached." *Angell v. Allstate Prop. & Cas. Ins. Co. (In re Caceres)*, No. 18-80776, 2023 WL 2543713, at *44 (Bankr. M.D.N.C. Feb. 27, 2023) (citing *Nadendla v. WakeMed*, 24 F.4th 299, 308 (4th Cir. 2022)). An implied term, such as the covenant of good faith and fair dealing, similarly cannot contradict the express terms of the contract. *See Hancock,* 378 F. Supp. 3d at 431 (citing *Vetco Concrete Co. v. Troy Lumber Co.*, 124 S.E.2d 905, 908 (1962)).

The Plaintiff asserts that the Defendant breached the implied covenant in two respects: (1) it unilaterally recruited physicians in which it knew Randolph Health had an interest; and (2) it made no effort to manage Randolph Health, instead pursuing its own financial interests through its "go it alone" strategy in Randolph County. (Docket No. 112, pp. 11-13). The Plaintiff contends that these actions constitute breaches of the implied covenant, separate and apart from a traditional breach of contract claim; the Defendant, he maintains, actively worked to deprive Randolph Health of key benefits of the MSA, namely a larger system's managerial and recruiting support. (Docket No. 112, pp. 11, 13).

The Court finds that the Plaintiff's second argument regarding the Defendant's self-interested management is too closely intertwined with his breach

of contract claim to survive as a stand-alone cause of action for breach of the implied covenant. The Plaintiff asserts that, during the time it was exploring the "go it alone" strategy, the Defendant "did nothing to adequately manage Randolph Health;" specifically, the Plaintiff points to the Defendant's failure to address Randolph Health's negative operating margin, significant capital requirements, liquidity issues, cash flow budgeting, and need for insolvency expertise. (Docket No. 112, p. 13). These examples of deficient management overlap with the factual bases cited by the Plaintiff as breaches of the MSA, including Sections 3(b), (e), (h), (i), and (m). If the Court finds the Defendant's managerial acts did not breach the express terms of the MSA, the Plaintiff cannot "avoid those same provisions by alleging the exact same conduct breached the implied covenant of good faith and fair dealing." *Nadendla*, 24 F.4th at 308. Given the close connection, the Court is unable to find that the Defendant's deficient management and "go it alone" strategy violated the implied covenant of good faith and fair dealing "separate and distinct" from its express obligations under the MSA. *Heron Bay Acquisition, LLC v. United Metal Finishing, Inc.*, No. 12 CVS 5505, 2014 NCBC 15 ¶ 66, 2014 WL 1878885, at *15 (N.C. Super. Ct. May 7, 2014). Accordingly, this argument is subsumed into the Plaintiff's breach of contract claim, and the Court will consider both simultaneously at trial.

The Court holds a different view, however, on the Plaintiff's other theory for the Defendant's breach of the implied covenant—its alleged efforts to recruit physicians away from Randolph Health and Randolph County. The parties do not

dispute that, over the course of the MSA, the Defendant employed certain physicians who previously worked in Randolph County and were associated with Randolph Health. The practices or groups that the Defendant acquired included that of Dr. Gupta and Carolina Cardiology, both of which subsequently left Randolph County for a period of time after joining the Defendant. (Pl.'s SMF ¶¶ 66-68, 71-72; Def.'s SMF ¶ 81; Eblin Dep. 102:23-103:16; Orth June 23 Dep. 56:8-25).

The parties vigorously dispute the circumstances that led to those physicians' departures or decisions to affiliate with the Defendant. The Plaintiff argues that the Defendant recruited physicians without the involvement of Randolph Health and solely for its own benefit, moved those practices out of Randolph County thereby depriving residents of critical specialties and coverage, and then compounded its breach of good faith and fair dealing by failing as manager "to fill the huge voids created by its recruitment of these physicians." (Docket No. 130, p. 5). The Plaintiff relies on testimony from Eblin and Orth, the former of which testified that the Defendant "capitalized on some of [Randolph Health's] – the information [it] shared about physicians and who might be vulnerable leaving other – leaving for other communities or other organizations." (Eblin Dep. 144:11-14). In emailed notes to herself regarding the MSA, Orth similarly stated that Randolph Health "identified a number of physicians that would be ideal for CH to recruit, assuming that [Randolph Health] would be come its integration partners. Cone Health reached out to many of these physicians. Many of these physicians are at risk for leaving our community due to Cone's contact." (Orth June 24 Dep. Ex. 13).

The Defendant, in contrast, argues that "there is no record evidence that Cone Health recruited any physicians or practice groups that Randolph Health did not ask Cone Health to pursue or that were not specifically and explicitly encouraged by Randolph Health to join Cone Health (or an affiliated entity.)" (Docket No. 115, p. 24). Eblin testified that he advised the Defendant to approach Carolina Cardiology and likewise "encouraged Carolina Cardiology to take that meeting … thinking that the merger was on its way." (Eblin Dep. 145:17-25). Although Dr. Gupta officially departed after he left his position as CEO, Eblin recalled that "I know I told [the Defendant] at some point, they need to employ Gupta. I went back to him. He said he wasn't interested, but ultimately they employed Gupta." (Eblin Dep. 147:4-9).

The Plaintiff's argument regarding physician recruitment, unlike that centered on deficient management, may be viable as a free-standing claim for breach of the implied covenant since it does not require a finding that the Defendant outright failed to perform its express obligation under the MSA to "develop[] … a physician recruitment plan[.]" (Pl.'s Ex. 6, § 3(g)). Depending on the ultimate determination of disputed material facts at trial, the Court may find that the Defendant did not breach its requirement to develop a physician recruitment plan under Section 3(g), but nevertheless breached the implied covenant by wrongfully recruiting vulnerable physicians it knew Randolph Health expressed interest in, thereby undercutting Randolph Health's attempts to implement the recruitment plan and obtain benefits owed under the MSA. The Court must

determine at trial disputed facts regarding the circumstances under which the Defendant recruited physicians such as Dr. Gupta and Carolina Cardiology, as well as the scope of the Defendant's duties under Section 3(g).

The Court must also ascertain the Defendant's motives in recruiting the physicians in question. Any breach of the implied covenant of good faith and fair dealing requires "the wrongful intent of a party to deprive another party of its contractual rights." *Carolina Quarries, Inc. v. Martin Marietta Materials, Inc.*, No. 1:20CV1043, 2023 WL 3346673, at *7 (M.D.N.C. May 10, 2023) (quoting *Dull v. Mut. of Omaha Ins. Co.*, 354 S.E.2d 752, 757 (N.C. Ct. App. 1987)). "Where a party 'ma[kes], in good faith, what it believed to be a sound business decision based on a reasonable view of its contractual rights,' courts will not find a violation of the implied covenant of good faith and fair dealing." *Carolina Quarries*, 2023 WL 3346673, at *7 (quoting *E. Town Mkt., L.P. v. 550 Foods, LLC*, 776 S.E.2d 364 (N.C. Ct. App. 2015)). "Determining whether a party to a contract acted in good faith is a question of fact determined on a case-by-case basis and thus often inappropriate for summary judgment, however, where a party provides virtually no evidence or makes only conclusory allegations of bad faith, summary judgment is appropriate." *Carolina Quarries*, 2023 WL 3346673, at *8 (cleaned up).

At summary judgment, the Court is unable to make credibility determinations regarding the Defendant's intentions in recruiting physicians such as Dr. Gupta and Carolina Cardiology. *Id.*; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Plaintiff does provide evidence calling into question

the Defendant's motives and good faith in its recruitment efforts. In an email at

3:19 p.m. on January 3, 2019, CEO Orth informed certain staff members about a

request she received from Driggers, the Defendant's physician recruitment director,

for a copy of Randolph Health's physician needs assessment:

> This email is simply to close the loop regarding Cone Health's request for a copy of our most recent Physician Needs Assessment completed by Ascendient … [Driggers] did not provide me with any reasonable rationale to support the request. Therefore, I told [Driggers] that I would not share the report since we are not collaborating with Cone Health on physician recruitment matters. I also told [Driggers] that I had shared a concern with Terry Akin, CEO at Cone Health that Cone was attempting to recruit members of our medical staff. If you receive a request directly from Cone regarding any strategic information, please refer the individual to me."

(Orth June 23 Dep. Ex. 15).

Hours later, at 8:11 p.m. on the same day, Driggers directly emailed the

creator of the assessment, Ascendient, to obtain the same information, explaining

that

> …our executive team has requested supply data for Randolph Health service area. They do not want us (Ascendient or my team) to contact Randolph for this data. Is this something you all can do? If so, please let me know the estimated time it will take to start and complete this project and the estimated cost.

(Driggers Dep. Ex. 17).

This evidence undercuts the Defendant's insistence that the recruiting efforts

at issue were only undertaken with the knowledge and explicit encouragement of

Randolph Health and its leadership team. The Court, therefore, finds the Plaintiff

has offered more than simply conclusory or speculative allegations and has

presented sufficient evidence to render the Defendant's motives and good faith a disputed question to be resolved at trial.

### 3. Unfair and Deceptive Practices

The Plaintiff argues that the Defendant's actions also violated the UDP. North Carolina declares as unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a). "In order to establish a prima facie claim for unfair trade practices, a plaintiff must show: (1) the defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Bumpers v. Cmty. Bank of N. Va.*, 747 S.E.2d 220, 226 (N.C. 2013) (internal citations omitted). "[A] practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Gray v. N.C. Ins. Underwriting Ass'n*, 529 S.E.2d 676, 681 (N.C. 2000) (quoting *Marshall v. Miller*, 276 S.E.2d 397, 403 (N.C. 1981). "A practice is deceptive if it has the capacity or tendency to deceive; proof of actual deception is not required." *Sain v. Adams Auto Grp., Inc.*, 781 S.E.2d 655, 661 (N.C. Ct. App. 2016) (quoting *Huff v. Autos Unlimited, Inc.*, 477 S.E.2d 86, 88 (N.C. Ct. App. 1996)). If a defendant is found to have violated N.C. Gen. Stat. § 75-1.1, a plaintiff demonstrating injury is automatically entitled by statute to treble any actual damages proximately caused by a violation of the UDP. N.C. Gen. Stat. §§ 75-16, 75-16.1; *see also Gray*, 529

S.E.2d at 684; *Marshall*, 276 S.E.2d at 402 (finding legislature intended "trebling of any damages assessed to be automatic once a violation is shown").

Whether a defendant has performed the act asserted is a question of fact for a jury; it is then a question of law for the court as to whether these proven facts constitute an unfair or deceptive practice. *Gray*, 529 S.E.2d at 681; *S. Atl. Ltd. P'ship of Tenn., L.P. v. Riese*, 284 F.3d 518, 534 (4th Cir. 2002). Although there are facts in genuine dispute as to the Defendant's recruitment of certain physicians in Randolph County, *see* supra section 2, the Court must also, at summary judgment, examine the legal merits of the Plaintiff's claim to assess whether the Defendant's actions "would be found as a matter of law to not violate Section 75-1.1, even after assuming the jury found all disputed facts in Plaintiff's favor." *Champion Pro Consulting Grp., LLC v. Impact Sports Football, LLC*, 116 F. Supp. 3d 644, 652 (M.D.N.C. 2015).

Here, the Plaintiff argues that the Defendant "unilaterally recruited… physicians away from Randolph County and away from Randolph Health" despite its responsibilities to identify and assist with Randolph Health's physician recruitment efforts. The Plaintiff also contends that the Defendant, "armed with knowledge that Randolph Health was failing, egregiously used this information and its position to benefit only itself." (Docket No. 112, pp. 13-16). The Defendant's actions, the Plaintiff concludes, "resulted in fewer physicians in areas of real need in Randolph County and led to the downfall of the community's only non-profit hospital." (Docket No. 130, p. 7).

North Carolina law does allow for the Plaintiff to "maintain both a breach of contract claim and an unfair and deceptive trade practices claim," *see In re Charlotte Com. Grp., Inc.*, No. 01-52684C-11W, 2003 WL 1790882, at *3 (M.D.N.C. Mar. 13, 2003), but "[t]o maintain both claims, a plaintiff must allege substantial aggravating circumstances." *Id.*; *Ellis v. Louisiana-Pacific Corp.*, 699 F.3d 778, 787 (4th Cir. 2012). As this Court recently described, "[c]ourts applying North Carolina law … have grown skeptical of contract-related section 75-1.1 claims, cautioning that, in evaluating a UDP claim, courts must guard against permitting a litigant to transform a breach of contract claim into a UDP claim." *In re Caceres*, 2023 WL 2543713, at *42 (Bankr. M.D.N.C. Feb. 27, 2023) (cleaned up).  As the North Carolina Business Court has recognized:

> It is far more difficult to allege and prove egregious circumstances *after* the formation of the contract. One reason for this is that disputes concerning the circumstances of the breach are often bound up with one party's exercise of perceived rights and remedies under the contract. Even where the exercise of contractual rights is 'allegedly contrary to the terms of the agreement,' the legal question concerns the interpretation and application of the agreement – that is, whether the agreement has been breached.'

*Post v. Avita Drugs, LLC*, No. 17 CVS 798, 2017 NCBC 93 ¶ 26, 2017 WL 4582151, ay *5 (N.C. Super. Ct. Oct. 11, 2017) (quoting *Taylor v. United States*, 89 F. Supp. 3d 766, 773 (E.D.N.C. 2014)) (emphasis original); *see also Eastover Ridge, L.L.C. v. Metric Constructors, Inc.*, 533 S.E.2d 827, 833 (N.C. Ct. App. 2000) (quoting *Broussard v. Meineke Disc. Muffler Shops*, 155 F.3d 331, 347 (4th Cir. 1998)) (observing that it is "unlikely that an independent tort could arise in the course of contractual performance, since those sorts of claims are most appropriately

addressed by asking simply whether a party adequately fulfilled its contractual obligations."). Therefore, to warrant relief, a UDP contract-based claim must demonstrate the requisite aggravating circumstances, which "must be substantial and independent of the performance of the parties' obligations under the existing contract." *In re B & K Coastal, LLC*, No. 11-08609-8-JRL, 2013 WL 1935300, at *7 (Bankr. E.D.N.C. May 9, 2013) (collecting cases).

Even taking all material facts asserted by the Plaintiff in support of summary judgment as true, the Plaintiff's UDP claim is rooted only in the Defendant's allegedly deficient performance and breach of its duties under the MSA, not the circumstances around both parties' entry into the agreement or deception in the circumstances of the breach. The Defendant's efforts to recruit physicians in Randolph County, including Carolina Cardiology and Dr. Gupta, are closely intertwined with its obligations, and potentially flawed performance, under Section 3(g) of the MSA regarding development of a physician recruitment plan. The Defendant's purportedly deficient management of Randolph Health, which possibly benefitted the Defendant's own expansion efforts in the county, similarly implicates its performance under Sections 3(b) (managerial resources), 3(h) (revenue cycle), 3(i) (budgets), and 3(m) (maintenance and repairs) of the MSA. At best, the Plaintiff's allegations amount to the Defendant's intentional breach of the contract by deciding to pursue its own financial interests in Randolph County while ignoring those of its client, Randolph Health. Given this close connection, the Court finds the factual basis for the Plaintiff's UDP claim is too "bound up" with the Defendant's rights and

duties under the MSA, *see Post*, 2017 NCBC 93 ¶ 26, 2017 WL 4582151, at *5, and

is not sufficiently "independent of the performance of the parties' obligations under

the existing contract." *In re B & K Coastal*, 2013 WL 1935300, at *7.

The Plaintiff also fails to produce evidence showing that the Defendant's

breach of the MSA was sufficiently egregious to impose liability under the UDP. To

do so, a plaintiff must demonstrate that "the circumstances of the breach exhibit

clear deception" such as "forging or destroying documents." *Post*, 2017 NCBC 93 ¶

28, 2017 WL 4582151, at *5. *See Garlock v. Henson*, 435 S.E.2d 114, 115 (N.C. Ct.

App. 1993) (finding evidence that defendant forged a bill of sale in an attempt to

extinguish the plaintiff's ownership interest was sufficiently aggravating to support

a UDP claim); *N. Carolina Mut. Life Ins. Co. v. McKinley Fin. Servs. Inc.*, No.

1:03CV00911, 2005 WL 3527050, at *12 (M.D.N.C. Dec. 22, 2005) (finding that "the

intentional destruction of relevant documents" in an attempt to conceal a breach

could constitute substantial aggravating circumstances). Other examples of

"aggravating and egregious behavior include: (1) lying and concealing a breach

combined with acts to deter further investigation; and (2) intentional deception for

the purpose of continuing to receive the benefits of an agreement." *Foodbuy, LLC v.

Gregory Packaging, Inc.*, 987 F. 3d 102, 121 (4th Cir. 2021); *see also Interstate

Narrow Fabrics Inc. v. Century USA, Inc.*, 218 F.R.D. 455, 465-66 (M.D.N.C. 2003)

(denying summary judgment for the defendants where a jury could find the

defendants executed the agreement with the intention of breaching it and

thereafter engaged in intentional deception for the purpose of "continu[ing] to reap

the benefits of the Agreement"); *In re Caceres*, 2023 WL 2543713, at *42 (finding that intentional misrepresentation of a contractual duty to defend in order to conceal a potential breach of implied duty of good faith and fair dealing would be sufficient to support contract-based UDP claim); *Foley v. L&L Int'l, Inc.*, 364 S.E.2d 733, 736 (N.C. Ct. App. 1988) (upholding UDP claim where the defendant retained the plaintiff's down payment for seven months while falsely claiming it had ordered the car). Conversely, coercive statements regarding a party's view of its legal rights under a contract, *see PCS Phosphate Co. v. Norfolk S. Corp.*, 559 F.3d 212, 224 (4th Cir. 2009), as well as "refusal to otherwise meet" contractual obligations do not rise to the level of aggravating circumstances. *Deltacom, Inc. v. Budget Telecom, Inc.*, No. 5:10-CV-38-FL, 2011 WL 2036676, at *4 (E.D.N.C. May 22, 2011).

While the Plaintiff asserts that the Defendant was misleading or secretive in its handling of the due diligence and LOI process as well as its recruitment of physicians, this conduct was not attended by sufficiently egregious or aggravating circumstances to warrant a finding that such conduct was unfair or deceptive under the UDP. There is no evidence presented of forgery, document destruction, or deception; similarly, there is no evidence that the Defendant acted to deter Randolph Health's knowledge, or investigation of its physician recruitment efforts or strategic choices. This is simply not "the unusual case in which the circumstances of the breach itself are egregious and deceptive." *Post*, 2017 NCBC 93 ¶ 30, 2017 WL 4582151, at *6. Instead, the Plaintiff's claim for unfair and deceptive practices is, at its core, a restatement of his claims for breach of contract and breach of the

implied duty of good faith and fair dealing and is "best resolved by simply determining whether the parties properly fulfilled their contractual duties." *Mitchell v. Linville*, 557 S.E.2d 620, 624 (N.C. Ct. App. 2001).

Although not raised by the Defendant, for reasons unknown to the Court, the Plaintiff's claim also appears to be barred by the learned profession exemption, which applies to claims for unfair and deceptive practices. The UDP prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat.§ 75-1.1(a). Although "commerce" under the UDP "includes all business activities," it "does not include professional services rendered by a member of a learned profession." N.C. Gen. Stat.§ 75-1.1(b). The party asserting the exemption carries the burden of proof on the issue. N.C. Gen. Stat. § 75-1.1(d). Courts are instructed to conduct a two-part inquiry to determine whether this "learned profession exemption" (also referred to as the "learned profession exception") applies: "[F]irst, the person or entity performing the alleged act must be a member of a learned profession. Second, the conduct in question must be a rendering of professional services." *Sykes v. Health Network Sols., Inc.*, 828 S.E.2d 467, 472 (N.C. 2019) (quoting *Wheeless v. Maria Parham Med. Ctr., Inc.*, 768 S.E.2d 119, 123 (N.C. Ct. App. 2014)). As to the first inquiry, North Carolina courts have held that "members of health care professions fall within the learned profession exemption to N.C.G.S. § 75-1.1, and '[t]his exception for medical professionals has been broadly interpreted.'" *Id.* (quoting *Shelton v. Duke Univ. Health Sys., Inc.*, 633 S.E.2d 113, 117 (N.C. Ct. App. 2006)).

Here, the Defendant is an operating hospital, which North Carolina courts have determined qualifies as a "medical professional" for purposes of the learned profession exemption. *See Shelton*, 633 S.E.2d at 117 (finding hospital qualifies for exemption); *Harwani v. Moses H. Cone Mem'l Hosp. Operating Corp.*, No. 1:21CV522, 2023 WL 2753655, at *11-12 (M.D.N.C. Feb. 28, 2023) (finding hospital operating corporation qualifies for exemption).

Turning to the second inquiry, the Court must consider whether the conduct in question implicates the rendering of professional services, which includes any "matter affecting the professional services rendered by members of a learned profession." *Sykes,* 828 S.E.2d at 472 (citing *Burgess v. Busby*, 544 S.E.2d 4, 11-12 (N.C. Ct. App. 2001)). The Plaintiff alleges that the Defendant, in breach of its obligations under the MSA, recruited physicians either in pre-existing relationships with Randolph Health or that it knew Randolph Health wished to retain. The Plaintiff further argues that the Defendant made no effort to fulfill its duties as manager, instead acting solely in its own business interests in Randolph County to the ultimate detriment of Randolph Health. In both instances, the Plaintiff maintains that the Defendant's actions significantly damaged not only Randolph Health, but also the county's healthcare consumers by reducing the number of physicians "in areas of real need in Randolph County" and by causing "the downfall of the community's only non-profit hospital." (Docket No. 130, pp. 6-7).

In determining whether the offending conduct falls within the learned profession exemption, "the Court is not concerned with whether the conduct runs

afoul of other legal or ethical standards, but only whether the conduct affects the professional services rendered by members of a learned profession." *Alamance Fam. Prac., P.A. v. Lindley*, No. 18 CVS 913, 2018 NCBC 82 ¶ 60, 2018 WL 3871627, at *9 (N.C. Super. Ct. Aug. 14, 2018). Although the Plaintiff's allegations raise serious concerns regarding public health in Randolph County, the Defendant's offending conduct squarely falls within the learned profession exemption. The Plaintiff's UDP claim focuses, in large measure, on the impact of the Defendant's actions on Randolph County's medical consumers. The North Carolina Supreme Court, however, has held that similar actions resulting in a diminution of services fell within the meaning of rendering professional services:

> In addition, plaintiffs allege that—through the operation of HNS's monopsony—chiropractic services are being reduced, meaning that North Carolinians who were previously receiving care from providers in HNS's network have either ceased receiving this care or have received fewer services due to HNS's enforcement of its average cost cap on providers. Since the basis for plaintiffs' UDTP claim is that chiropractors are reducing the level of services patients receive, we conclude that the conduct alleged in the second amended complaint is sufficiently related to patient care to fall within the rendering of professional services, as that term has been previously interpreted by the courts of this state.

*Sykes*, 828 S.E.2d at 473-474. One of the primary bases for the Plaintiff's UDP claim is that the Defendant's actions reduced the level of services Randolph County patients received in certain key practices. In line with the guidance of *Sykes*, this Court finds that the Defendant's alleged conduct is sufficiently related to patient care to fall within the rendering of professional services.

The Plaintiff also grounds his UDP claim in the Defendant's efforts to usurp or divert physicians and business opportunities to itself, which the Plaintiff argues

further accelerated Randolph Health's financial decline. But North Carolina courts have found the learned profession exemption applies "where a plaintiff alleges that the unfair or deceptive acts constituted anticompetitive conduct directed by one learned professional at another." *Alamance Fam. Prac.,* 2018 NCBC 82 ¶ 58, 2018 WL 3871627, at *8 (finding the defendant's conduct in illegally obtaining patient data and using that data to solicit the plaintiff's patients related to the provision of allergy testing services and fell within learned profession exemption); *see also Harwani,* 2023 WL 2753655, at *11-12 (finding, despite assertions that conduct in question related to real estate transactions, that the plaintiff's claim was ultimately a challenge to the decision to terminate or suspend privileges); *Cameron v. New Hanover Mem'l Hosp., Inc.*, 293 S.E.2d 901, 920 (1982) (rejecting the plaintiffs' argument that the learned profession exemption does not exclude alleged anticompetitive conduct); *Wheeless*, 768 S.E.2d at 123 (concluding that defendant-medical professionals' sending of an anonymous letter to the medical board about plaintiff-medical professional was within the exemption, notwithstanding the plaintiff's allegations that the defendants illegally accessed and used confidential peer review and patient records and acted out of malice and for financial gain). Here, the anticompetitive conduct of the Defendant cited by the Plaintiff, including recruitment of physicians and diversion of business opportunities, related to provision of medical services in Randolph County. "[T]he fact that an anti-competitive or financial motive is alleged is not sufficient to take the case out of the exemption." *Harwani*, 2023 WL 2753655, at *12.

Based on the reasoning above, the Court concludes that the Plaintiff's UDP claim fails to identify necessary substantial aggravating facts and would also be barred by the learned profession exemption. The Court, therefore, will grant the Defendant's motion for summary judgment as to the Plaintiff's UDP claim.

CONCLUSION

This memorandum constitutes the Court's findings of fact and conclusions of law. An order will be entered contemporaneously with the entry of, and in accordance with, this memorandum opinion.

January 29, 2024

Lena Mansori James
United States Bankruptcy Judge